```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                   IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
      SOFTVIEW LLC,
 4                                      :  CIVIL ACTION
                 Plaintiff,             :
 5                                      :
                      v.                :
 6                                      :
      APPLE INC., AT&T MOBILITY LLC, et al., :
 7                                      :  NO. 10-389 (LPS)
                 Defendants.            :
 8                              - - -

 9                          Wilmington, Delaware
                            Thursday, May 3, 2012
10                          Oral Argument Hearing

11                              - - -

12    BEFORE:     HONORABLE LEONARD P. STARK, U.S.D.C.J.

13                              - - -
      APPEARANCES:
14

15              BLANK ROME, LLP
                BY:  STEVEN L. CAPONI, ESQ.
16
                       and
17
                IRELL & MANELLA
18              BY:  MORGAN CHU, ESQ., and
                     SAMUEL K. LU, ESQ.
19                   (Los Angeles, California)

20                       Counsel for SoftView, LLC

21
                RICHARDS LAYTON & FINGER, LLP
22              BY:  STEVEN J. FINEMAN, ESQ.

23                     and

24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

1    APPEARANCES:   (Continued)

2

3                FARELLA BRAUN + MARTEL LLP
                 BY:   RODERICK M. THOMPSON, ESQ.
                       (San Francisco, California)

4

5                          Counsel on behalf of Dell, Inc.

6                POTTER, ANDERSON & CORROON, LLP
                 BY:   RICHARD L. HORWITZ, ESQ.

7                      and

8

9                GIBSON DUNN & CRUTCHER, LLC
                 BY:   JOSH A. KREVITT, ESQ., and
                       STUART M. ROSENBERG, ESQ.

10                     (Palo Alto, California)

11                         Counsel for Apple Inc.
                           and AT&T Mobility LLC

12

13               RICHARDS LAYTON & FINGER, LLP
                 BY:   FREDERICK L. COTTRELL, III, ESQ.

14                     and

15               BAKER BOTTS, LLP

16               BY:   SCOTT F. PARTRIDGE, ESQ.
                       (Houston, Texas)

17                     and

18               BAKER BOTTS, LLP

19               BY:   ELIOT D. WILLIAMS, ESQ.
                       (New York, New York)

20                         Counsel for Huawei Technologies, Co.,

21                         Ltd., Huawei Technologies USA and
                           Huawei Device USA Inc.

22

23               SHAW KELLER, LLP
                 BY:   JOHN W. SHAW, ESQ.

24                         Counsel for HTC Corporation, HTC

25                         America, Inc. and Exedea, Inc.

```
1    APPEARANCES:  (Continued)

2

3                MORRIS NICHOLS ARSHT & TUNNELL, LLP
                 BY:  RODGER D. SMITH, II, ESQ.
4
                        and
5
                 KILPATRICK TOWNSEND & STOCKTON, LLP
6                BY:  WILLIAM H. BOICE, ESQ.
                        (Atlanta, Georgia)
7
                            Counsel for Motorola Mobility, Inc.
8                           and AT&T Mobility, LLC

9
                 GREENBERG TRAURIG, LLP
10               BY:  GREGORY ERICH STUHLMAN, ESQ.

11                      and

12               GREENBERG TRAURIG, LLP
                 BY:  HERBERT H. FINN, ESQ.
13                      (Chicago, Illinois)

14                          Counsel on behalf of LG Electronics,
                            Inc., LG Electronics USA, Inc., and LG
15                          Electronics Mobilecomm USA Inc.

16
                 YOUNG CONAWAY STARGATT & TAYLOR, LLP
17               BY:  ADAM W. POFF, ESQ.

18                      and

19               COVINGTON & BURLING, LLP
                 BY:  KINDRA M. BAER, ESQ.
20                      (Washington, District of Columbia)

21                      and

22               SAMSUNG ELECTRONICS AMERICA, INC.
                 BY:  BRYAN D. RICHARDSON, ESQ.
23                      (Washington, District of Columbia)

24                          Counsel on behalf of Samsung
                            Telecommunications America, LLC
25
```

1  APPEARANCES:  (Continued)

2
                    PHILLIPS, GOLDMAN & SPENCE, P.A.
3                   BY:   JOHN C. PHILLIPS, JR., ESQ., and
                          MEGAN HANEY, ESQ.
4
                          and
5
                    KATTEN MUCHIN ROSENMAN, LLP
6                   BY:  MICHAEL A. DORFMAN, ESQ.
                         (Chicago, Illinois)
7
                              Counsel on behalf of Kyocera Corp.
8                             and Kyocera Wireless Corp.

9

10                  MORRIS NICHOLS ARSHT & TUNNELL, LLP
                    BY:  RODGER D. SMITH, II, ESQ.
11
                              Counsel on behalf of Sony Ericsson
12                            Mobile Communications (USA) Inc.

13

14

15

16                              - oOo -

17                      P R O C E E D I N G S

18              (REPORTER'S NOTE:  The following oral argument

19   hearing was held in open court, beginning at 10:01 a.m.)

20              THE COURT:  Good morning, everyone.

21              (The attorneys respond, "Good morning, your

22   Honor.")

23              THE COURT:  Let's start by putting your

24   appearances on the record for me, please.

25              MR. CAPONI:  Good morning, your Honor.  Steve

```
 1    Caponi from Blank Rome for SoftView.  With me today is
 2    Morgan Chu and Sam Lu from Irell & Manella.
 3              MR. CHU:  Good morning, your Honor.
 4              MR. LU:  Good morning.
 5              THE COURT:  Good morning.
 6              MR. FINEMAN:  Good morning, your Honor.
 7              THE COURT:  Good morning.
 8              MR. FINEMAN:  Steve Fineman from Richard Layton
 9    & Finger.  At counsel table with me today is Rod Thompson
10    from Braun & Martel.
11              We were just going to let all the defendants
12    introduce themselves as they spoke today but if your Honor
13    would like to do introductions now.
14              THE COURT:  Yes, let's get it done right up
15    front.
16              And, Mr. Fineman, who are you on behalf of?
17              MR. FINEMAN:  Dell, your Honor.
18              THE COURT:  Dell.  Thank you.
19              MR. HORWITZ:  Good morning, your Honor.  Rich
20    Horwitz from Potter Anderson on behalf of Apple and AT&T;
21    and with me today from Gibson Dunn & Crutcher, Josh Krevitt
22    and Stuart Rosenberg.
23              MR. ROSENBERG:  Good morning, your Honor.
24              THE COURT:  Good morning.
25              MR. SHAW:  Good morning, your Honor.  John Shaw
```

```
 1   from Shaw Keller for the HTC parties.
 2              THE COURT:  Okay.
 3              MR. POFF:  Good morning, your Honor.  Adam Poff
 4   on behalf of Samsung.  And with me are Kindra Baer from
 5   Covington & Burling and Bryan Richardson from Samsung.
 6              THE COURT:  Welcome.
 7              MR. SMITH:  Good morning, your Honor.
 8              THE COURT:  Good morning.
 9              MR. SMITH:  Rodger Smith from Morris Nichols.
10   I'm here today with Bill Boice from Kilpatrick Townsend on
11   behalf of AT&T and Motorola; and I'm by myself on behalf of
12   Sony Ericsson.
13              THE COURT:  Thank you.
14              MS. HEANEY:  Good morning, your Honor.  Megan
15   Heaney from Phillips Goldman & Spence on behalf of Kyocera.
16   With me today is Michael Dorfman from Katten Muchin.
17              THE COURT:  Okay.  Thank you.
18              MS. HEANEY:  Thank you.
19              MR. STUHLMAN:  Good morning, your Honor.  Greg
20   Stuhlman from Greenberg Traurig here in Wilmington on behalf
21   of the LG defendants.  With me today is my colleague Herbert
22   Finn from my firm's Chicago office.
23              MR. FINN:  Good morning.
24              THE COURT:  Good morning.
25              MR. COTTRELL:  Good morning, your Honor.
```

1                    THE COURT:  Good morning.

2                    MR. COTTRELL:  Fred Cottrell from Richards

3    Layton for the Huawei, Futurewei defendants.  With me is

4    Scott Partridge.

5                    MR. PARTRIDGE:  Good morning, your Honor.

6                    MR. COTTRELL:  And Eliot Williams from the Baker

7    Botts firm.

8                    THE COURT:  Okay.

9                    MR. COTTRELL:  Thank you, your Honor.

10                   THE COURT:  Last but not least; right?

11                   MR. COTTRELL:  Yes, that's correct, your Honor.

12                   THE COURT:  All right.  Well, I wanted to do

13   that not to give you a short shrift but we have a lot to

14   cover today and I want to move through it fairly quickly; in

15   fact, more quickly than you all may have intended.  I know

16   we gave you 90 minutes a side but I'm not going to be able

17   to give you the full 90 minutes per side and I don't think

18   it will be necessary.

19                   Let me tell you my inclinations with respect to

20   some of the motions.

21                   I am inclined on the 299 issue to grant the

22   motion for severance, to the extent that the defendants seek

23   separate trials as being required under Section 299.

24                   I am not inclined to dismiss; and my main

25   concerns are how we're going to coordinate and/or consolidate

1  for pretrial purposes.

2          On the motion to stay pending reexam, I'm

3  inclined to deny those motions and keep these cases moving

4  forward here in a litigation posture.

5          As a result, what I need the most help on

6  really are the motions to dismiss based on the allegations

7  of indirect infringement and willful infringement.  I want

8  to move to those as quickly as we can but I want to give you

9  a chance to see if you can either confirm my views or change

10  them on the inclinations I have announced to you on the

11  other motions.

12          So the way we'll proceed is I want to first hear

13  from any defendant who wishes to talk about the 299 issue;

14  and once all the defendants who wish to be heard on 299 have

15  been heard, we'll let the plaintiff respond once and then

16  we'll see if defendants have anything to add.  Then we'll

17  do the same thing on the motion to stay pending reexam,

18  hear from all of the defendants, then give the plaintiff one

19  chance to respond and then see if there is anything left for

20  the defendants to say and then we'll get you focused on the

21  remaining motions to dismiss.

22          So with that, I will turn it over to whoever

23  wishes to speak first on the defense side on the 299 issue.

24          MR. THOMPSON:  Thank you, your Honor.  Rod

25  Thompson for Dell.  I think I can be quite brief on Section

1    299 given your Honor's comments.

2            Just to orient us all on dates.  This case

3    was filed May 10, 2010.  Almost 15 months later, the new

4    defendants were added, on September 30, 2011.  In between,

5    the reexaminations were filed.  That had been pending five

6    months before my client even heard of this action.

7            Also coincidentally, in September, Congress

8    enacted 299 and made clear that it was designed to address the

9    problems occasioned by the joinder of defendants, sometimes

10   numbering in the dozens, who have tenuous connections to the

11   underlying disputes in patent infringement suits.

12           This case fits it to the "T."  I'm happy to

13   talk about why, as to these defendants, the new defendants,

14   the action was not commenced and 299 applies.  It sounds

15   like your Honor may have reached the same conclusion, so

16   I'll hold my breath on that.

17           THE COURT:  I think it's best to see if

18   plaintiff has anything that could persuade me otherwise

19   since I'm with you at this point.

20           MR. THOMPSON:  Okay.  So the remaining issue

21   then is severance.  Certainly, I think that is within the

22   Court's discretion whether to dismiss or sever and the

23   severance is perfectly appropriate.

24           What does that mean?  We just want to be sure

25   that the severance is effective now.  That it's not a matter

1    of delaying it until all the pretrial proceedings are taken

2    care of and just worry about separate trials.

3              THE COURT:  Why is that?  Why not just put off

4    the issue of how many trials or whether in fact they'll be

5    separate until the pretrial conference?

6              MR. THOMPSON:  Well, putting off the issues

7    of trials until the final pretrial conference in each case

8    makes sense and certainly coordination of all the cases

9    makes sense as a matter of sound case management.  I think

10   all the defendants would agree that, for example, the

11   Markman proceeding, you obviously have great efficiencies

12   from doing it all at once with all of the separate cases.

13             However, there is a lot of other burden on

14   defendants from pretrial, from discovery, from experts.  And

15   what Congress has said is that the problems occasioned by

16   that, by lumping together dozens of defendants together in

17   one case in pretrial is not tolerable and they fixed it with

18   299.

19             So, your Honor, what we would suggest is to

20   sever each of the cases now, to look at and perhaps give the

21   parties a chance to make suggestions to your Honor how best

22   to move forward now.  Coordinating as much as we can on

23   claim construction and Markman proceeding and having one

24   common hearing.

25             But with other things such as discovery, for

1      example, my client Dell happens not to sell the product that

2      are accused here anymore.  They were not very successful.

3      We are a little bit indifferent.  I know many of the

4      defendants behind me have very successful products.  So each

5      one would have different issues and it can be handled in

6      different ways.

7              So the severance should take place now pursuant

8      to 299; and I think the parties in the court can work on the

9      coordination as your Honor envisioned.

10             THE COURT:  Okay.  Thank you.

11             MR. THOMPSON:  I would like to talk later about

12     the stay.

13             THE COURT:  Yes, later on.

14             MR. THOMPSON:  One final note.  By severing

15     now, it makes your Honor's determination about the stays

16     much more easy then.  That's one example of case management

17     efficiencies that can be achieved by severing right now.

18             Thank you, your Honor.

19             THE COURT:  Does anybody else want to be heard

20     on just on the 299 issue?

21             MR. PARTRIDGE:  And, your Honor, I may be

22     jumping ahead.  If I am, I will sit right back down but it

23     was the part of your initial statement about coordinating

24     for pretrial.

25             THE COURT:  Coordinating.

1          MR. PARTRIDGE:  If you want to discuss that

2     separately, I'll take my seat.

3          THE COURT:  I want to hear coordinating now.

4          MR. PARTRIDGE:  Okay, very good.  I represent

5     Huawei.  We're one of the added defendants.

6          We moved for a severance and then moved for a

7     stay.  We didn't seek the dismissal.  We think that separate

8     trials are required here as your Honor has indicated and

9     intends to rule.

10          From our point of view, your Honor, this now

11     becomes really sort of a Rule 42 case management issue for

12     you for purposes of pretrial.  And it seems to us, given

13     that we are a year and-a-half later in all of this than AT&T

14     and Apple, and even though we worked out a schedule pending

15     your Honor's ruling on these matters, it seems to us there

16     are some things that you will want to do with everybody

17     involved.  For example, I wouldn't suggest to you that you

18     have multiple Markman hearings.  You ought to have one

19     Markman hearing.  And,

20          I wouldn't suggest to you that we not produce

21     the core technical document that are required in accordance

22     with your Honor's order.  That we ought to do those things

23     that are appropriate for the Markman hearing.

24          Then the question becomes what else do we do if

25     anything?  It's clear, I think, your Honor, that you are

1   going to need to have pretrial handled differently for the

2   different defendants because you are not going to be able to

3   try these cases all at the same time.

4           There is going to be a set of trials.  Maybe

5   some parties will fall by the wayside before we get there,

6   but you're going to need a set of trials.  And it makes

7   sense to have a set of pretrial proceedings that match the

8   timing of those various trials.  And it may well be as we

9   get further down the road that your Honor looks at the

10  situation and the earlier case, the Apple, AT&T case, and

11  you may say and we may argue to you at that point in time,

12  let's have that trial go first, see how the jury comes

13  back and how your Honor feels about the jury verdict and

14  post-trial motions before you set us for trial.

15          Given that we are not competitors with SoftView,

16  and this is a money case, that is what it is about, it seems

17  to us that we ought to set aside oppressive discovery.  And

18  I think it could be oppressive within a case like this, it

19  could be substantial at least, and it will be expensive;

20  that we narrow what we do between now and the time of our

21  trial.

22          So my preference would be to have discussions

23  with SoftView's counsel about what makes sense, agree that

24  we go forward with Markman, but get back to you on what

25  makes sense with respect to everything else.

1        Thank you, your Honor.

2        THE COURT:  Thank you.  Do any of the other

3    defendants want to be heard on 299, including the

4    coordination?  No.

5        Okay.  Let's hear from plaintiff.

6        MR. CHU:  Thank you, your Honor.  Good morning.

7    Morgan Chu on behalf of SoftView.

8        Let me first address the law of Section 299

9    and the case law; and then, second, I want to address the

10   practical issues which your Honor has rightfully focused

11   upon.

12       Well, what is the law for Section 299?  The

13   statute doesn't provide clear guidance on what is meant by

14   when an action is "commenced" so we look to the case law

15   logic and practical issues.

16       So what is the principal case law?  Well, the

17   case law we cited, *Buller Trucking*, we cited the *Wallace*

18   case and other cases, I think they're set out well in the

19   brief so I want to focus upon the case that the defendants

20   rely most heavily and almost singularly, and that is the

21   *Farina* case.  It involves a different statute but it does

22   involve a question of when an action commenced.

23       The choice there was did the action commence on

24   the date where there was a filing that first named the new

25   defendant or an earlier date, which was the original

1    complaint, where the new defendant was not named at all?

2            The *Farina* case held that it was the date based

3    on the filing when the new defendant's name first appeared

4    and not the earlier date of the original complaint where

5    there was no mention of the new defendant.

6            If anything, that case supports SoftView's point

7    of view because our position is in April of 2011, five

8    months before the Court granted leave to amend, all of these

9    defendants had been named in a filing.  We're not seeking to

10   have it as of an earlier date such as the original complaint

11   but we are saying that it is almost five months before the

12   effective date of the AIA.

13           Another way to look at it, on a practical basis.

14   Let's suppose a party is awaiting action from the Court and

15   the Court, this Court and all courts in the federal system

16   are incredibly busy, and we see the approaching date of the

17   effective date of AIA and suppose we think all of the

18   defendants who use the Android operating system, which is

19   the principal basis for the infringement, ought to be in one

20   case instead of split up into tiny little multiple cases.

21           Well, we could have, on September 15th, after

22   waiting four and-a-half months, simply filed a new complaint

23   against that.  It's really more than eight defendants, but

24   grouping them, eight defendant groups, we would have filed a

25   unified complaint and that is what the action would be

1    before the Court.  So there is the practical issue, too.

2              THE COURT:  Well, talking about practicalities,

3    maybe you could have but you didn't.  And as a practical

4    matter, for instance, did you serve the amended complaint

5    on the other defendants, the eight groups of them prior to

6    September 30th?

7              MR. CHU:  We did not.  We know to a certainty --

8              THE COURT:  If you had served discovery on them

9    and they weren't really in the case, but if they had

10   complied with my discovery procedures and objected to your

11   discovery saying, hey, we're not a party yet, you think I

12   would have allowed you take discovery from them prior to

13   September 30th?

14             MR. CHU:  Well, the answer there would be no.

15             THE COURT:  And what if I had ultimately denied

16   your motion for leave to amend?  How could it possibly be

17   that this action commenced against them in April when let's

18   say on September 30th, I said I'm not granting leave to

19   amend?

20             MR. CHU:  So what we have to do is both look

21   at the text of the statute; and, as they said, it didn't

22   provide any guidance; we look at the case law in analogous

23   areas.  We think the case law, including their principal

24   case, supports us.  And now I'm getting to the practical

25   issues that the Court is addressing.

1          It is clear, of course, although we could have

2     filed on September 15th, we didn't.  I should mention one

3     of the groups of defendants did file a declaratory relief

4     action in another District.  So they plainly knew about it.

5     And when we look carefully at the flurry of papers from all

6     the defendant groups, we didn't see a clear statement from

7     any of the other defendants saying that they were unaware

8     of our filing to seek to add them to the case.

9          THE COURT:  That may be the case, but I mean the

10    way our system works, you have to be served.  You have to be

11    named as a party, and you have to be served.  Before that,

12    you could be sitting in court, you could know everything

13    that is going on, but you have no legal obligations.  You

14    are not a party.

15         MR. CHU:  I understand that, your Honor.  What

16    we're trying to do is to see whether the AIA applies to this

17    case.  Let me get to some issues that are partially practical

18    and partially why we care about the word "commenced" in

19    different circumstances.

20         Some of the cases relied upon by both sides have

21    to do with the statute of limitations.  There, I think there

22    are real practical concerns from the point of view of the

23    defendants because we have statutes of limitation so that

24    the passage of time doesn't lead to the destruction of

25    documents, the fading of witness memories, and the like.

1          So we don't want a defendant to be prejudiced by

2     the passage of time unless they have the actual notice of

3     the complaint.  But, here, those issues aren't present.  The

4     issues present here boils down to, should this be a single

5     action or should it be carved up into individual actions.

6     Because even if our initial filing was actually five months

7     later than it actually was, so after the effective date, we

8     would still be arguing that this is a case where that group

9     of defendants should be together.  So let me address that

10    and then I also want a little bit of time to address the

11    coordination of issues.

12          So let's assume for the moment that the AIA

13    applies for the purposes of discussion.  Is the infringement

14    by all of the Android defendants the same?

15          The answer is yes.  There is nothing they add or

16    subtract to the Android operating system where all of them

17    get that operating system from the same supplier, Google.

18    There is nothing different, hardware or software, relevant

19    that is added by any of those defendants for the patents

20    before this Court.

21          THE COURT:  Is this your WebKit argument or is

22    this now a different argument?

23          MR. CHU:  It's somewhat different.  The WebKit --

24          THE COURT:  Is it in the complaint?  Is it in

25    the briefs?  Or is it brand new?

1                    MR. CHU:  It certainly is in the briefs, the

2      fact.  Let me just explain the fact the WebKit argument.

3                    THE COURT:  You have got a new argument and you

4      are not on the WebKit argument.

5                    MR. CHU:  No, I just want to explain the context

6      because you are right, your Honor, to call that out.

7                    The initial complaint against Apple is based on

8      the Apple operating systems.  It operates in a certain way

9      that when you open a browser page, you can pinch it, make

10     it smaller, or you can use your fingers to widen it, to zoom

11     in.  That same feature is used by Google and all of the

12     Android defendants with respect to the Android operating

13     system.

14                   The WebKit argument, I'm going to put aside

15     for a moment because we are saying that WebKit is in common

16     between Apple on the one hand and all of the Android

17     defendants on the other.  So it's a related but separate

18     argument.

19                   What I am saying with respect to all of the

20     Android defendants, there is not one issue of validity or

21     infringement that will be different in this case at any

22     time.  And despite attempts by some of them to suggest

23     otherwise, one would have to scratch one's head a lot to

24     understand those arguments they make.

25                   The core issue is that they used the Android

1   operating system and it has this pinching-like technology

2   that we allege infringes the patent.  So even if AIA does

3   apply, that group at least should stay together.

4          Now, we also think, because it is the same basic

5   technology, although Apple implanted it in its operating

6   system, that it should be the same case for all.  Now, here

7   is what the defendants would like to have.  Ultimately, at

8   trial, they want to have nine separate trials.

9          Well, why is that?  Well, there will be a

10   scramble, as in law school, to sit in the back row because

11   number nine gets to see eight other juries; and if any one

12   of those find that the patents are invalid, then number nine

13   will say we win automatically.

14          The validity issues will be the same.  They

15   ought not to be tried separately.  The infringement issues

16   are the same.  They ought not to be tried separately.  And,

17          Then there is the question about damages.  We

18   just heard an argument about Dell that they're in a unique

19   situation.  Well, that they have very, very small sales.  I

20   will accept counsel's representation.  It's very small

21   infringing sales based on the Android operating system and

22   so the numbers at trial will be different.

23          But the question of whether there should be a

24   unified trial for all purposes or a unified trial on all

25   issues but for damages is a question that can be left for

1     another day.

2              Now, what about discovery and everything in

3     between?  Let's just assume whether your Honor believes AIA

4     doesn't apply or does apply and nevertheless this group of

5     defendants should be together.

6              Well, there will be the deposition of the two

7     inventors.  We think there should be one deposition of each

8     of those inventors, not nine depositions.  There will be

9     other depositions of SoftView representatives or SoftView

10    witnesses or expert witnesses; and, again, since the issues

11    are all alike, there ought to be individual depositions.

12             Now, as a matter of case management, because the

13    Android defendants do compete with each other, it would make

14    sense -- and it would make sense if this case was filed as a

15    unified case two years ago -- if one of the defendants said

16    we want the deposition for our damages to be separate

17    without other counsel or representatives sitting in there.

18             Well, we can understand that.  Protective orders

19    are often fashioned to limit that exchange of information.

20             So this is actually precisely the kind of case

21    where the AIA recognizes there should be multiple defendants

22    and practical issues for trial and later can be decided with

23    more information by this Court.

24             Let me give you one other example, your Honor.

25    In this Court's order with respect to the 20 claims of the

1    issue, we identify 20 claims that we're asserting against

2    Apple.  This Court handwrote in the proposed order that with

3    respect to the new defendants, they must be selected from

4    among those 20 claims.  It's a matter of case management and

5    efficiency.

6              Well, let's say we have nine separate cases.

7    Let's say some of defense counsel will get up and try to

8    argue that their infringement or the basis of infringement

9    are really different.

10             Well, then we ought not to be limited to the

11   same 20 claims.  That would necessarily follow.  We could

12   assert 20 claims against Apple, and a completely different

13   20 claims against Dell, and a completely 20 claims against

14   Kyocera.  That would logically follow.

15             We respect your Court's earlier order recognized

16   that this case has core issues of validity and infringement

17   that bridge all of the defendants and further matters on

18   case management such as exactly how trial ought to be

19   conducted is best left for another day.

20             Thank you, your Honor.

21             THE COURT:  Thank you.  Is there anything from

22   defense?

23             MR. THOMPSON:  Thank you, your Honor.  Let me

24   respond briefly to both of Mr. Chu's points.

25             With respect to the case law, I'll be very brief

1    because I don't think I need to persuade you.  But the

2    Circuit court law, *Farina*, *Braud*, and *Prime Care*, which are

3    all cited in the papers, are very clear that a new action is

4    commenced every time a new party is added.

5         The *Buller Trucking* case that Mr. Chu is

6    relying on didn't add new parties.  As a matter of fact, it

7    distinguished itself from other situations because it didn't

8    add new parties.  It was amending to create a class action

9    for the first time; and that is the context in which that

10   District Court in Illinois made the holding that filing the

11   motion was the effective time.

12        The Circuit court authority is very clear.  And

13   by the way, Rule 3 itself commence a new case by filing a

14   complaint.  The complaint was filed here on September 30th.

15        Mr. Chu also mentioned that no defendant had

16   said that they didn't have notice.  Well, Dell, in our

17   papers, attested to that.  We had no notice of this case

18   until we were served, until the filing of this case.

19        THE COURT:  What about the argument that the

20   infringement issues are the same among all of Android

21   defendants?

22        MR. THOMPSON:  I think your Honor asked exactly

23   the right question.  Is that in the complaint?  The answer

24   is no.  It's not in there at all.

25        I think the WebKit is now in a fourth amended

1    complaint for the first time.  Mr. Chu said he has a new

2    theory that is not the WebKit theory.

3            For purposes of 299 and joinder, look at the

4    allegations of the complaint.  And let's go back to 299

5    because it's very clear on its face.

6            It requires joinder only if, only if the right

7    to relief arises out of the same transaction occurrence or

8    series of transactions.  That's number one.  It has to be

9    the same series of transactions.

10           Relating to the same accused product or process.

11           I have, Dell received this last Friday, Dell's

12   accused models.  There are four, actually five Dell-branded

13   products.  This is the accused product.  None of the other

14   defendants make these products.  No other defendants know

15   the hardware or software that goes into these products.

16   These are the accused products.

17           So, your Honor, neither of those elements are

18   established in 299.  It is not the same series of transactions.

19   Obviously, Dell sells to its own chain, its own suppliers,

20   its own service providers, and it's a different product.

21           If Mr. Chu has a new theory, it's not in the

22   complaint.  It can be tested if, and when, it ever gets

23   pleaded because 299 looks at the allegations of the complaint.

24   Clearly, under 299, severance at each of the separate

25   defendants is warranted.

1          THE COURT:  And what about the validity issues?

2     Those are certainly going to be the same, aren't they?

3          MR. THOMPSON:  Some validity issues will

4     undoubtedly be the same, depending on which.

5          THE COURT:  And does 299 allow the Court to have

6     a single consolidated trial on validity?

7          MR. THOMPSON:  299 doesn't speak to that, so you

8     fall back on the case law under Rule 42.  If efficiencies can

9     be achieved, I suppose that will be your Honor's discretion to

10    try to fashion something.  I guess the issues will not be the

11    same as the case develops.  Different defendants might have

12    different theories.

13         THE COURT:  Okay.  Thank you.

14         MR. THOMPSON:  Thank you, Your Honor.

15         MR. PARTRIDGE:  May I, your Honor?

16         THE COURT:  Yes.

17         MR. PARTRIDGE:  Let me start where you just left

18    off, if I may.

19         I don't think there is a clear answer about

20    validity trials.  When you look at Section 299, Subparagraph

21    B, it reads:  Accused infringer may not be joined in one

22    action as defendants or counterclaim defendants or have

23    their actions consolidated for trial.

24         So once we're severed, which I think the law

25    requires, I'm not sure that you can hold a common validity

1  trial for all of these defendants.

2          That said, your Honor, you raise a very

3  interesting question, and one that I think the defendants,

4  if you were interested in bifurcating this and having a

5  validity trial first, we haven't discussed that.  I don't

6  know whether my client would be interested in that, but

7  that is one of the interesting case management approaches

8  that you could consider.

9          I don't think you could necessarily order us

10 to do that under the law, but we could consider agreeing to

11 something like that.

12         So, as a matter of law, I think the answer is

13 no.  As a matter of trying to work things out and do what

14 makes sense, that is perhaps possible.

15         With respect to the argument that Mr. Chu made

16 about different claims against different defendants, well,

17 your Honor, if you did that, a Markman hearing would be

18 probably far less manageable than what you would hope and

19 what we would hope as defendants because now we would have

20 a lot more claims with a lot more claim terms potentially

21 in dispute.  And I think that is something you could manage

22 by virtue of Rule 42 amongst these now different cases.  I

23 don't think it makes sense to allow different sets of claims

24 against different defendants because of the Markman issue.

25         The third point I would make, your Honor, is

1    that the operating system that is at issue here amongst the

2    new defendants, the Android system, as you know is an open

3    source system.  The implementation of that open source

4    system I have no doubt varies amongst the defendants.

5                   I know that some variations were made by my

6    client.  At this point in time, I actually don't know what

7    those variations are.  Why?  I don't even have infringement

8    contentions yet from the plaintiff to know how to respond

9    to the WebKit argument that Mr. Chu made.

10                  Are the issues likely to be the same?  Is he

11   going to take that position once he has discovery of our

12   different products and sees in fact there are variations

13   that have been made?

14                  I think the way to deal with this case, as I

15   said previously, sever them as you have indicated, require

16   the parties to then go back and come back to you with a

17   proposal as to how to manage the discovery process.

18                  We'll all be together for Markman.  I think that

19   makes sense.

20                  Beyond that, the issues such as inventor

21   depositions, is it appropriate for us to have common

22   inventor depositions with an agreed number of hours and a

23   division of those hours amongst the defendants?  That may

24   be possible and that may be appropriate.  And there are a

25   number of other things that perhaps we should be doing here

1    and managing the cases.

2              But, unfortunately, I think we're in a position

3    now where it makes some sense for us to consult and get

4    back to you within a relatively short period of time as to

5    further recommendations as to how to phase what happens in

6    these cases now that they're severed.

7              Thank you, your Honor.

8              THE COURT:  Is there any other defendant on 299

9    consolidation?

10             Mr. Chu, I will give you the last word because I

11   haven't been persuaded to change my mind, but I will give

12   you one more shot, if you wish.

13             MR. CHU:  I feel like Casey, Mighty Casey coming

14   to the plate.  I hope the outcome isn't similar.

15             Your Honor asked a very good question about the

16   operative pleading.

17             One example in paragraph 28, it states in part,

18   "Samsung makes, uses, imports, offers to sell, and sells

19   devices having the Android operating system and web browser,

20   including, but not limited to," and then there is a listing

21   of the trade names under which they sell the devices.

22             That beginning language, by my quick scan,

23   forward and backwards, is identical for all of the Android

24   defendants.  What is accused of the infringement is the use

25   of the Android operating system and the web browser.

```
 1            The AIA, again, assuming for purposes of

 2   discussion that it applies, recognizes when there are common

 3   issues such as common issues of infringement, infringement

 4   by the same methods or an apparati as there are here, there

 5   should be a single case.  And that makes sense for all

 6   purposes, although the Court retains the discretion, when we

 7   get to trial, to order trial to be tried in a manner that is

 8   efficient.

 9            So the practical situation as well as the

10   statute would command that there should be a single case

11   here for the infringement by the Android operating system

12   and web browser.

13            THE COURT:  How is your reading of the complaint

14   any different than saying everybody infringes patent number

15   X and we're just going to call out some specific different

16   products for each of the different defendants?  How is that

17   any different?

18            MR. CHU:  Well, I'm not sure I'm capturing the

19   Court's question, but let me try.

20            THE COURT:  First, let me ask you this:  Do

21   you agree if the AIA applies and your allegation is simply

22   everybody infringes the same patent, but everyone has

23   different products, each of the defendants have different

24   products, don't you agree that that would be a case that

25   Congress intended by the AIA to be severed?
```

1                MR. CHU:  I disagree, your Honor, respectfully.

2     I think what Congress had in mind is a situation where

3     plaintiff says, I have a patent and these 50 defendants

4     infringe that patent, and Defendant 1 infringes with a

5     particular kind of device that is a mouse-pointing device

6     and Defendant No. 2 infringes with a TV clicker and

7     Defendant No. 3 infringes with a device for controlling a

8     model airplane that have nothing in common.

9                This is more like the following kind of case:

10    If you have an infringement by the Microsoft Windows

11    operating system and the infringement is basically caused --

12    I'm not being technical in terms of patent law -- but it is

13    basically caused in the way in which the operating system

14    operates, then whether Dell puts that operating system on a

15    Windows compatible computer or some other Windows compatible

16    computer maker does makes not one whit of difference for

17    purposes of infringement.

18                So Congress saw the world in two parts.  You

19    can't have this willy-nilly 50 defendants with completely

20    different bases for infringement in one case, but if you

21    have a group of defendants where there is one basis and it's

22    not based on you infringe my patent but you infringe my

23    patent by doing A,B,C and D, and they all do it in exactly

24    the same way -- and they do here because they all use the

25    same Android operating system.  The defendants recognize

1    that, and the operative pleading so alleged.

2              One other small point on case law.  The cases

3    argued by both sides a number of those cases relating to

4    that other statute.  The CAFA statute has to do with

5    removal.  And, of course, as your Honor knows, there is a

6    time limit of 30 days for defendant to remove a case.

7              So you can see the obvious prejudice if it

8    relates back to an original complaint that never even had

9    the defendant's name in it as opposed to when there was a

10   pleading that had the defendant's name.  It makes sense in

11   that circumstance.

12             This is a completely different circumstance

13   where the better management and following the dictates of

14   Congress, even if AIA applies, would be keeping these

15   defendants together in a single suit.

16             Thank you.

17             THE COURT:  Are you prepared to represent today

18   that you already understand each of the defendants' systems

19   well enough to know that they all infringe in precisely the

20   same way and I guess commit to that so that if any defendant

21   can say actually I don't infringe in precisely that same

22   way, then suddenly they're out of the case?

23             MR. CHU:  The infringement is from the Android

24   operating system, and it's this functioning Android operating

25   system.  And they all do it in the same way, because they

1  don't write their own.

2  THE COURT:  They're representing that there are

3  some potential modifications in how they implement it.  It's

4  an open source program, and we may find -- I mean that is the

5  question.  There is going to be discovery.  You're confident

6  that you are not going to find anything in discovery that

7  distinguishes any of the defendants, not even one of their

8  products, from any other on the infringing technology.

9  MR. CHU:  I believe that is the case, your

10  Honor.  I can't be absolutely certain to tell you what is

11  behind the curtain.  But it's a function that operates the

12  system.  Someone has got to be crazy to go in and rewrite

13  that code because they're going to end up injecting all

14  kinds of bugs that might not only affect the operation of

15  these particular functions but it might affect the rest of

16  the operating system.

17  So maybe if one of the defendants is truly

18  insane, they've made some changes and maybe that is why

19  someone didn't have such great sales, which they may drop

20  out anyway.  But I believe that we will find that what

21  infringes is from the Android operating system and it's

22  identical across the defendants.

23  Here is another way to look at it as a practical

24  matter.  There is no harm by keeping the case together now.

25  If, by chance, my confidence is shaken and we find out that

1        there truly are differences, the Court can always revisit

2        the issue at that point in time.

3                    Thank you, your Honor.

4                    THE COURT:   Thank you.

5                    All right.   Well, there are interesting

6        arguments; and there is, in the Court's view, no case law

7        that answers the question that is put before me today with

8        respect to the multiple motions under Section 299.   But I have

9        not been persuaded to alter my conclusion, notwithstanding

10       the interesting points that have just been made before me.

11                   So we will enter a written order that grants

12       each of the 299 motions to the extent that they seek

13       severance for purposes of separate infringement trials.

14                   In all other respects, at this point the relief

15       requested by the defendants is denied.

16                   Let me say just a few things about how I reached

17       that conclusion.   In the Court's view, the statute, the new

18       statute Section 299 does apply because this action was not,

19       in the Court's view, commenced against the Android defendants

20       until the motion for leave to amend was granted, which was

21       September 30th, which obviously postdates the September 16th

22       adoption or enactment of Section 299.

23                   In the Court's view, the filing of the motion

24       for leave back in April did not commence an action against

25       the Android defendants.   It simply asked for permission to

1   commence such an action.  There was never any guarantee

2   that that permission would be granted; and had it not been

3   granted, it would be very odd to view an action as having

4   been commenced in April when in September the request for

5   permission to commence it was denied.

6           Furthermore, nothing that would have to occur

7   upon the commencement of an action such as service of the

8   complaint and discussion of discovery and scheduling and

9   potential service of discovery, none of that did happen or

10  indeed could have happened in the time between April and

11  September.

12          The cases cited by both sides in the Court's

13  view are distinguishable and none of them, of course, deal

14  with the new statute before the Court today.  While the

15  Court understands as a general matter in the statute of

16  limitations context that for equitable reasons, a party

17  should not be deemed to have waived or lost a cause of

18  action it would otherwise have just by virtue of the Court's

19  taking the time it needs to resolve, for instance, a request

20  for leave to amend to add a party or to add a claim.  Those

21  equitable considerations are not applicable in the context

22  of the issue as it arises today.

23          In the Court's view, this is the type of situation

24  where the statute is the statute and any intent beyond the

25  statute requires separate infringement trials.  The theory

1    articulated today purporting to find a commonality, in fact

2    an identicality as I understand it, among the infringement

3    allegations amongst all the Android defendants is, in the

4    Court's view, a theory that was not at least articulated

5    adequately in the briefing.  It strikes the Court as a new

6    theory.  It is ultimately not persuasive in any event because

7    it takes, in the Court's view, too narrow and too precise a

8    view of what has been alleged.

9           The Court simply doesn't read the complaints in

10   the same manner that the plaintiff is arguing they should be

11   read.  All reasonable inferences being drawn in favor of the

12   plaintiff, it would be unusual to read these complaints as

13   being so narrowly drafted as the plaintiff argues such that

14   it would essentially, by its own admission, the plaintiff,

15   have no claim against any defendant who modified in the

16   slightest way the alleged infringing technology, and that is

17   not how the Court reads the complaints here.

18          The Court is not revisiting its prior rulings

19   with respect to the number of asserted claims or where they

20   must be chosen from.

21          The Court is certainly open to the possibility

22   of and perhaps even ordering a coordinated or consolidated

23   validity trial because it is difficult to imagine how the

24   validity issues will necessarily be different.  However,

25   that is an issue that the Court would need further briefing

1    on, perhaps even there will be some case law by the time we

2    get to trial in this matter.

3              So at this point, beyond what I have ruled,

4    the only additional direction to you all is that you should

5    at this time meet and confer and, based on what I have

6    determined today, which is that separate infringement trials

7    will be necessary, barring agreement amongst the parties to

8    the contrary, discuss amongst yourselves what implications

9    that has for the schedule that has been adopted and do

10   discuss the possibility of a consolidated trial on validity,

11   and I'll see what you come up with.

12             But if you don't reach an agreement on validity,

13   that is a matter that we will have to address as we get

14   closer to the first of these trials.  Because I'm not yet

15   persuaded that I lack authority to order a consolidated

16   validity trial.

17             If it turns out, as I suspect, that those

18   issues will be essentially identical among the defendants,

19   I want to hear back regarding your efforts on meeting and

20   coordinating in response to what I have ruled today within

21   14 days of today.

22             All right.  Let's move on now to the stay issue.

23   Again, we'll hear first from the defendants.

24             MR. KREVITT:  Thank you, your Honor.

25             John Krevitt from Gibson Dunn on behalf of

1     Apple.  I will be addressing first the stay issue, and other

2     defendants may wish to be heard.

3              I heard your Honor's tentative ruling, of

4     course, and it is clear from your Honor's past practice and

5     even in the ruling just now your Honor has given careful

6     consideration to the tentative ruling.  So rather than going

7     through an entire argument, I do want to make sure I focus

8     on the issues of concern to the Court.

9              I will say at the outset, which will not surprise

10    the Court, I'm prepared to explain why we think this is a

11    clear-cut case for a stay when you look at the three factors,

12    simplification, procedural posture of the case and any

13    prejudice to the defendant, each and every one in our view,

14    and I am prepared to talk about why.

15             THE COURT:  Let's talk about simplification.

16    First of all, I don't know if there is any update anyone

17    can provide on the reexams.  But as I understand it, 90 of

18    the claims here survived the initial Office Action without

19    amendment, without rejection, without cancellation.  Is that

20    still the status?

21             MR. KREVITT:  Yes, your Honor.  That is still

22    the status, although there have been further proceedings

23    that I would be happy to explain to your Honor.  But at this

24    moment, as we stand here or sit here, that is, that remains

25    the case.

1          THE COURT:  And so what is the likelihood that

2     at the end of the day, we're going to see substantially

3     fewer than 20 of the original patent claims emerge without

4     substantive amendment?

5          MR. KREVITT:  Well, your Honor, if I may answer

6     that.  If I can back up a moment and provide some context

7     for the reexam, but please again let me know if there are

8     particular issues you want me to focus.

9          I think it's helpful to understand, this is an

10    unusual reexamination process in that it's not the typical

11    reexam where the party seeking the reexamination has

12    submitted a few pieces of prior art and there is a fight

13    about whether that prior art discloses a particular element

14    or not.

15         The reason for that has to do with the central

16    issue that is now being addressed in the reexam.  And it's

17    this:  When the '353 patent was originally filed -- there is

18    two patents in the case, as your Honor is aware.  When the

19    complaint was first filed, there was only one, and then

20    another patent was added.

21         When the '353 patent was originally filed and the

22    parent application, all of the claims were limited to vector

23    claims.  All of the claims had an element requiring vector

24    being used to be the method or as part of the apparatus.

25    Every claim.  It was in the title of the patents, summary of

1    the invention, the abstract, every embodiment, and every

2    single claim.

3            In January of 2007, the iPhone was announced.

4    The iPhone, we will prove at the appropriate time, does

5    not use the vector technology at all.  What SoftView did

6    virtually immediately thereafter was strip the '353 of the

7    vector limitations.  So they changed the title of the

8    patent, they changed the abstract, the summary of the

9    invention, and many of the claims to remove in all of those

10   instances the word "vector."  So the patent in SoftView's

11   contention was no longer limited to vector.

12           Some claims still had the word "vector."  From

13   many other claims, the word "vector" had been removed.

14           Virtually simultaneously, they filed the '926

15   patent, which is the second patent in this case.  And that

16   patent also had the word "vector" no longer originally

17   filed.  It did have vector in the title, did have vector

18   in the summary of the invention.  Those were all removed

19   as well.

20           So we filed a reexamination in which we sought

21   reexamination and argued that there is a substantial new

22   question of patentability as to all of the claims.

23           What the Patent Office has done so far is it

24   has agreed with Apple with respect to the claims that do

25   not have the term "vector," so all of the non-vector claims,

1   if you will, have now been rejected, and the Patent and

2   Trademark Office has thus far disagreed with respect to the

3   claims that still have the term "vector."

4           The meaning, the scope, the understanding of

5   the term "vector" indisputably is relevant to this case.

6   SoftView will not stand up and tell you otherwise.  There

7   can be no dispute on that question.

8           There also can be no dispute, your Honor, that

9   that question is currently being addressed, meaning the

10  meaning, the scope of the term "vector" and related terms,

11  vector-related terms, by the Patent Office right now.

12          So Apple has submitted, in response to the Office

13  Actions that allowed the vector claims to issue, has submitted

14  additional statements.  It's an inter partes reexam, as your

15  Honor is aware, so Apple is able to participate in that.

16          SoftView will have an opportunity and almost

17  certainly will take a position as to what the "vector" term

18  means.  So the question of what vector means, which is

19  absolutely relevant to this litigation, will be addressed

20  in the reexam.

21          What is the likelihood of those 90 claims

22  emerging that have already been allowed, the question your

23  Honor asked?  I suspect you will hear a different answer

24  from different people that stand at the podium.

25          It is our view that those claims will be

1    rejected.  And we have put our money where our mouth is in

2    that respect, and we submitted expert declarations to the

3    Patent and Trademark Office.

4         We think the statements that the PTO have made,

5    the examiners have made in allowing those claims so far

6    clearly invite the submission of new prior art, which we

7    have done.  We have submitted new prior art that solves

8    the problems that were identified by the Patent Office, the

9    things that the Patent Office thought the prior art was

10   insufficient to render the vector claims invalid.  We have

11   now, in our view, solved those problems.

12        There is no dispute that about we have

13   responded to the Patent and Trademark Office Office Actions

14   on those points and have, in fact, because the rules require

15   it, submitted recently ex parte reexaminations, new ones

16   that submit that additional art.

17        The reason, just to be clear, I say the rules

18   require it, the rules don't require us to do anything, but

19   we're not able to submit the new art in the currently

20   pending inter partes reexam.  So for the Patent Office to

21   consider it, we needed to submit the additional reexamination.

22        THE COURT:  So you are continuing to fight the

23   validity before the PTO of the non-vector claims.

24        MR. KREVITT:  Absolutely, your Honor.  Again,

25   the Patent and Trademark Office will ultimately make the

1    decision on whether or not we're right with respect to the

2    reexaminations, but I can absolutely represent to your Honor

3    that we strongly believe that, ultimately, the Patent and

4    Trademark Office will reject those claims, and that at an

5    absolute minimum, your Honor, SoftView will take positions

6    on that question.  The Patent and Trademark Office will

7    take positions on that question.  The prosecution history

8    on the very issue that will be central to this case will be

9    developed, there can be no dispute on that, even if the 90

10   claims do emerge.

11          And just one point on numbers.  You're correct

12   about 90 claims.  Of course, there are only 20 claims

13   asserted against Apple pursuant to your Honor's previous

14   ruling.  Of those, 14 have the term "vector."  So we're

15   talking about six claims that do not have the term "vector"

16   that have all so far been rejected.

17          SoftView, incidentally, is fighting that, has

18   already submitted a response to the Patent and Trademark

19   Office, contending that the PTO got it wrong with respect

20   to the claims that do not have the term "vector."

21          THE COURT:  So I think I had the numbers flipped

22   in my mind.  Only six of the 20 that they asserted against

23   you have survived to the moment?

24          MR. KREVITT:  No, I'm sorry.  I made a mistake.

25          THE COURT:  Fourteen have.

1          MR. KREVITT:  Correct, your Honor.  I'm sorry if

2     I created that.

3          THE COURT:  There are 14 non-vector claims

4     asserted.

5          MR. KREVITT:  Correct.  No.  Your Honor, I'm

6     sorry.

7          THE COURT:  Okay.

8          MR. KREVITT:  There are 14 claims that have the

9     term "vector" in them.  It is the claims with the term

10    "vector" that have so far been allowed.

11         THE COURT:  I see.

12         MR. KREVITT:  Six of the claims do not have the

13    term "vector."  Those six, along with all the other claims

14    that do not have the "vector" term have been rejected so far.

15         So this is a very, very, I think objectively

16    speaking, active prosecution.  It is moving quickly since

17    these motions were filed.  There will be continuing Office

18    Actions since SoftView put in its opposition.  They have

19    filed a submission with the Patent and Trademark Office with

20    respect to the claims that have been rejected.

21         So, again, your Honor, with respect to the

22    simplification issues, it is our view that there really can

23    be no dispute that what happens in the Patent Office in

24    connection with the reexam is directly relevant to and

25    ultimately will simplify the issues in this court.

1            Just on the simplification, I would add one

2       thing.  That is that SoftView has thus far not been willing

3       to agree not to amend its claims.  As your Honor is aware

4       from other cases in which your Honor has denied motions for

5       stay, that is a factor that your Honor has considered.

6            Well, the plaintiff has said we're not going to

7       make this a moving target.  We're going to stick with the

8       claims.  If they're allowed, great.  If they're not and we

9       have to amend them, we won't assert them in this litigation.

10      Thus far, SoftView has not agreed to be bound -- to not

11      amend claims and assert those in this litigation.

12           So the prosecution continues.  What happens in

13      the prosecution is indisputably relevant to this litigation.

14      And what is more, claims may get amended as we go forward.

15      And those claims could be, if they are claims that have

16      already been asserted against Apple, can continue to be

17      asserted presumably in this litigation.

18                THE COURT:  Now, you initiated the reexams.

19                MR. KREVITT:  Yes.

20                THE COURT:  That distinguishes you from all your

21      friends on the other side or on your side.

22                MR. KREVITT:  Yes, your Honor.

23                THE COURT:  They all seem to think it's a

24      point in their favor that they did not try to deprive the

25      plaintiff of their forum whereas you arguably did.  I would

1    like you to respond to that but also more generally, do I

2    have eight, nine, or more different balances to do or do I

3    really have to decide are we staying this case as to all of

4    you or I'm not staying it as to all of you?

5              MR. KREVITT:  Well, then let me answer the

6    separate questions that you asked.  That will be articulated

7    by my friends as a point in their favor, certainly, and has

8    been in the papers, that they didn't file the reexam.

9              It does not follow, your Honor, and I submit

10   that it is not the case, that it is a point against Apple

11   that we did file the reexam.

12             So it has been a factor that the Court has noted

13   in prior cases that the party seeking the reexam has not

14   been the party -- excuse me -- seeking the stay has not been

15   the party that initiated the reexam, but the fact that we

16   sought the stay should not be a factor that weighs against

17   Apple in this case.

18             Here is why, your Honor.  It goes to the second

19   question:  the balancing.  The relevant inquiry, your Honor,

20   I respectfully submit is an objective question, by and

21   large.  Will it simplify the issues?  What is the procedural

22   posture of the case?  And will the plaintiff be prejudiced?

23             As to the simplification, we addressed that.

24   The procedural posture of the case -- and it goes to this

25   issue that we filed the reexamination.  SoftView repeatedly

1    in their papers, over and over and over again, states that

2    the reexaminations were filed a year after the complaint was

3    filed in this case.  And they keep hammering that point that

4    somehow militates against a stay.  They have filed a case

5    and then a year later we filed the reexamination.  Shouldn't

6    that mean there should not be a stay?

7            But it's the wrong question, your Honor.  The

8    right question, your Honor has asked exactly this question

9    in previous decisions, is how does the relative status of

10   the litigation compare with the status of the reexamination?

11           And because of the issues that your Honor

12   addressed in the previous motion as to what happened when

13   this additional complaint was added, we're at Square One

14   essentially in this litigation.  We're about to meet and

15   confer and propose a schedule to your Honor.  A schedule was

16   just put in place less than a month and-a-half ago, I think.

17           There has been no depositions taken.  There is

18   no trial date set in this case, your Honor.  There has been

19   no claim construction process whatsoever, although it's true

20   we've exchanged, meaning Apple and SoftView, some documents

21   and some written discovery.

22           This case was put on ice essentially, your

23   Honor.  And it's not been put on by the defendants as in

24   *Intellectual Ventures* case, when they moved to transfer and

25   took other steps, but it was put on ice by SoftView.  I'm

1    not casting aspersions or suggesting they did anything

2    improper.  I'm simply suggesting they did what they did,

3    which was take the Apple case, which was moving apace, and

4    decide to add to that case 18 new defendants or eight new

5    defendants, however you add them up, and at the same time

6    represent in their motion papers to the Court, when they

7    filed that motion, your Honor, that should your Honor grant

8    that motion, it would require a reset.  It would require a

9    new schedule.  Dates would all have to get pushed out.

10            So we're in a situation, your Honor, where the

11   reexams were filed in May.  The complaint that broadened the

12   other defendants was filed in September.  Coincidently, the

13   same day -- excuse me -- September 30th, the same day your

14   Honor allowed that complaint to be filed.  The Patent and

15   Trademark Office started rejecting claims in connection with

16   the reexamination.  There has been numerous actions since

17   then.  And since then, SoftView has added new complaints, a

18   third amended complaint and a fourth amended complaint.

19            The operative complaint, your Honor, to which

20   the other defendants will be answering, to which we needed

21   to file an answer, was filed in March of 2012, just two

22   months ago.

23            So when you look at where this case is, and

24   this is a fact that your Honor has addressed in all of the

25   motions to stay, both those that your Honor has granted and

1    denied, when you look at the fact that there is no trial

2    date set, no claim construction, virtually no discovery,

3    and you compare that with a very active reexamination, it's

4    clear that the procedural posture, along with the

5    simplification, also favors a stay, strongly.

6              I hope that answer your Honor's question.

7              THE COURT:  Well, it does.  But the broader

8    question -- because this another factor that distinguishes

9    you, which is there is some degree of estoppel that kicks in

10   because you have sought the reexam.

11             MR. KREVITT:  Yes, your Honor.

12             THE COURT:  Unless your codefendants surprise me

13   and say they're going to be estoped as well voluntarily.

14   That is arguably a point in your favor and a point against

15   their effort to seek a stay.  But I have to manage this case

16   or cases.

17             MR. KREVITT:  Yes, your Honor.

18             THE COURT:  Can I stay it as to some of you and

19   not as to others or do you agree I need to make a single

20   heads-or-tails decision as to whether litigation is going

21   forward?

22             MR. KREVITT:  I think the precise answer to your

23   question is yes, you can stay as to some and go forward as

24   to others.  I don't think the question you are asking,

25   though, about the estoppel quite implicates that issue for

1   the following reason.

2          Given what your Honor has ruled in connection

3   with the 299 motion that we will be having separate trials,

4   subject to the point your Honor made about a potential

5   validity trial, but assuming we have separate trials, Apple

6   will be estopped from relying on prior art that was

7   submitted in connection with the reexaminations pursuant to

8   the operative rules.

9          The other defendants will take the positions

10  they take.  I think you won't be surprised this morning but

11  they will take the positions they take and those positions

12  will govern those trials.

13         It's a point strongly in favor of a stay with

14  respect to Apple, your Honor, because it will absolutely

15  simplify the issues.  When we go to trial, if we go to

16  trial, if claims emerge and we go to trial, a large part of

17  the validity defense, maybe the entire validity defense with

18  respect to prior art, we don't know, may be gone.

19         There are obviously other validity issues.

20  There will be other issues.  I'm not suggesting that there

21  may never be a trial.  But it cannot be said that the

22  estoppel does not strongly weigh in favor of a stay because

23  it absolutely, by definition, simplifies the issues for trial.

24         So you have a situation, your Honor -- and I

25  understand that your Honor came in with a tentative ruling

1    and has given that thought, so I do want to make sure I

2    address the questions.  But from our perspective, when you

3    look at the final factor, which I haven't address and maybe

4    I can do that quickly before I answer any additional

5    questions, and that is prejudice to the plaintiff, there

6    is no prejudice to the plaintiff here, your Honor.  The

7    plaintiff has taken the position in papers, and it's not

8    surprising, they do not compete with the defendants.  They

9    do not have a competing product with the defendants.

10         Most of the cases, your Honor, in which this

11   Court has denied motions for stay involved competitors, in

12   some cases involved situations where the plaintiff argued

13   that their business would be decimated, that they would

14   cease to exist.  That was the position taken by the

15   plaintiff in the *Leader v Facebook* case and the *Cooper*

16   *Notification* case.  Similarly, they were competitors, your

17   Honor.

18         It is very rare to deny a motion for a stay in

19   the instance such as this where the plaintiff is not a

20   competitor.  It's been done.  Your Honor did it in the

21   *Intellectual Ventures* case, I understand that.  I'm not

22   representing that it can't be done or it has never been

23   done, but it is certainly unusual to do absent other

24   compelling factors such as delay on the part of the

25   defendants, which has not been the case here.

1           The reason we are where we are, your Honor, is

2      because the plaintiff -- from the procedural posture of

3      the case, there should be no question about this -- the

4      plaintiff injected the additional defendants and requested

5      that this Court reset the case and put us back at Square

6      One.  And when you couple that with the fact that the PTO is

7      actively engaged in addressing issues, that will be directly

8      relevant to this case, all of the factors in our view

9      clearly weigh in favor of a stay.

10          The final point I will make, your Honor, unless

11     your Honor has questions, is your Honor in some of the

12     Court's decisions has also considered if there is prejudice

13     to the defendants in moving forward.  And I understand that

14     is not one of the three typically enunciated factors but it

15     is a consideration your Honor has addressed before.  And we

16     believe there will be prejudice, substantial prejudice with

17     having to proceed with this case particularly if a plaintiff

18     is allowed to amend the claims.

19          Just one point by way of background.  Your Honor

20     may recall we had a protective order dispute long ago in this

21     case and we sought to preclude the plaintiff's law firm from

22     participating in any actions at the Patent and Trademark

23     Office.  And your Honor denied that request.  Your Honor said,

24     in fact, that reexaminations are part of the litigation, and

25     that the same law firm can review confidential information and

1    participate in the reexamination process.

2            So we could have a situation, your Honor, where

3    while this case is going forward, while Apple is producing

4    all of its confidential information, while other defendants

5    are producing confidential information, SoftView remains

6    free to amend its claims to continue to move that target

7    based on positions that Apple takes and the other defendants

8    take in the litigation and, of course, in the reexamination,

9    and that presents substantial prejudice to the defendants.

10           It also presents additional prejudice to the

11   defendants insofar as we have to plan this case.  We have

12   to search for prior art.  We have to try to prove the

13   invalidity of the claims.  And to the extent that the claims

14   get amended, get changed, and the clock meanwhile for the

15   case has been moving forward substantially prejudices the

16   defendants' ability to prepare the defense in this case.

17           So all of those factors from where we sit, your

18   Honor, strongly weigh in favor of a stay.  I understand your

19   Honor's tentative ruling and some of the questions your

20   Honor has addressed but to the extent there are other

21   things weighing on the Court's mind that in the Court's mind

22   favor denying the motion, I'd be interested in having the

23   opportunity to address them.

24           THE COURT:  Sure.  I think the only other thing

25   is what is your best guess as to how long these proceedings

1   in the PTO are going to take?  And as I understand it, both

2   sides will have a chance to appeal if they're unhappy.

3                 MR. KREVITT:  Yes.

4                 THE COURT:  So how long of a stay am I signing

5   up for if I go with you?

6                 MR. KREVITT:  Well, it's fair question, your

7   Honor.  I think the relevant inquiry with respect to time

8   doesn't involve the appeal because the appeal is, there is

9   an appeal from this case and there is an appeal from the

10  PTO.  So the question is, which is going to get to the

11  appellate court quicker?

12                At the rate that the Patent and Trademark Office

13  is moving in this reexamination, we have every reason to

14  believe that that could wrap up relatively soon.  Not next

15  week but certainly in less than a year.

16                The reason for that your Honor is given the Office

17  Actions that have already taken place, we expect, in the inter

18  partes reexam, an Office Action any day.  That Office Action

19  hopefully, by no means certainly, but hopefully will reject

20  the remaining claims in the SoftView patents.

21                If it does, SoftView will have an opportunity to

22  respond, of course, and there may be additional actions, but

23  it is moving very quickly.  Each of those Office Actions, as

24  your Honor may be aware, take place within a couple months

25  of each other roughly.

1            We have filed, as I said, the ex parte reexams.

2    We expect those -- we have hoped and asked and expect those

3    to get folded into the inter partes reexamination process.

4    Hopefully, that will move things quickly because then you

5    won't have extended it out by virtue of the ex parte reexam,

6    so we'll move along on the same schedule as the inter partes

7    reexam.

8            In that respect, your Honor, I should note we

9    have done everything we can at the Patent Office:  responding

10   timely, trying to fold in the ex parte reexaminations, to move

11   the reexamination process forward as quickly as we possibly

12   can.

13           That's different than other cases that your

14   Honor has considered and denied motions, cases where your

15   Honor has put a case on a fast track, for example, where

16   there was a trial date set or a trial date set soon.  None

17   of those factors exist here.

18           So we have every reason to believe, your Honor,

19   that we will get to the end of the reexamination process

20   more quickly than when we get to the end of the trial court

21   process before your Honor.

22           THE COURT:  Okay.  Thank you.  I will leave a

23   little bit of time to briefly hear if there are other

24   defendants.  Particularly if there are any other that are

25   going to stand up and say they're willing to be estopped, I

1    want them to rush up as well.

2                 MR. CHU:  We cede our time to said defendants.

3                 THE COURT:  Yes.  Yes.

4                 I see nobody rushing.

5                 MR. THOMPSON:  Let me just make a couple of

6    brief points.

7                 First, your Honor asked whether you should

8    necessarily engage in a separate balancing for the new

9    defendants, maybe different from the Apple defendants.

10                I think that has to be the case.  We have

11   separate actions.  We have been severed for trial.

12                Now, I think the analysis will be very closely

13   similar.  I think Mr. Krevitt did a very nice job of laying

14   out the factors for you which are common I think to all

15   defendants in most respects.  But, remember, your Honor, the

16   newly added defendants are strangers to this case and

17   strangers to the reexamination proceeding.

18                We didn't know about this case until it was

19   filed on September 30th, some four or five months after the

20   reexaminations had begun.  The die was cast, the table is

21   set.  We had nothing to do with that.  So I think that is a

22   significant difference weighing in favor of a stay for these

23   newly severed actions.

24                Putting that out a little bit further.  If you

25   look at it from our point of view, at this stage of the case,

1   the case is just beginning, just got filed in September.

2   We're just now beginning to head towards discovery.  It's very

3   early.  It was a five-month headstart in the reexamination

4   process.  And,

5               Finally, your Honor, and probably most

6   importantly, the final factor of unfair prejudice.  I think

7   you look at that from a different prism when you think of the

8   newly added defendants.

9               Not only is there no unfair prejudice, these

10  defendants clearly could not be involved in any tactical

11  advantage.  The reexaminations were filed.  We've got

12  nothing to do with that.

13              And as Mr. Krevitt mentioned, there is no

14  competition here.  There is no harm to SoftView.  They don't

15  make any products.  And as I mentioned earlier, with respect

16  to my client, there is no possible harm because there is no

17  more selling going on.  A stay would not possibly prejudice

18  SoftView any further.

19              So for those reasons, we think, we encourage

20  your Honor to consider us separately.  The balancing is

21  close, it is similar.  But I do think it is important to

22  deal with separately for each of these newly added defendants.

23              With respect to estoppel, your Honor, I can't

24  represent that my client would be receptive to share the

25  full scope of the estoppel that Apple is facing.  I would

1   suggest that if your Honor is inclined to consider a stay,

2   with some perhaps more narrow version of the estoppel, that

3   that might be something that my client would entertain.

4            I'm not here to commit to anything at the

5   moment, but if there is a way we could find efficiencies,

6   some reassurance that the stay would maximize efficiencies,

7   efficiencies for the newly added defendants, certainly Dell

8   would be interested in exploring that.

9            THE COURT:  Okay.  Thank you.

10           MR. THOMPSON:  Thank you.

11           THE COURT:  Is there anyone else?

12           MR. PARTRIDGE:  I will be very brief, your

13  Honor, as I should be at this point.  I'll address the

14  estoppel issue first.

15           I do think and I concur that if your Honor is

16  inclined to grant a stay, then I think my client Huawei is

17  open to considering an estoppel that goes so far as the

18  prior art combinations that have been asserted by Apple in

19  the reexaminations.

20           I haven't asked precisely that question to my

21  client, but if your Honor is inclined to stay, I think that

22  is a fair question to ask the defendants.

23           I don't think the estoppel should be of the

24  scope that the law provides with respect to Apple who

25  initiated the inter partes reexaminations because we have

1    not had the opportunity to choose the prior art to be

2    selected.  We should not be precluded from finding and

3    asserting other prior art in the event these patents ever

4    come out of reexamination.

5            So a narrow version of an estoppel in a limited

6    period of time, maybe a week or so for us to all consult

7    with our clients and get back to your Honor, would make some

8    sense to me, speaking only for my client.

9            The second point I would like to make, your

10   Honor, is that you, as probably everybody else in this

11   courtroom today, have dealt with a lot of stay motions based

12   on reexaminations and other factors.  I always ask myself a

13   question of what is happening and what will we know six

14   months from now that we don't know today?

15           I'm not as close to the inter partes and ex

16   parte reexaminations as Apple and its counsel are, but my

17   understanding is that we have reached the point where the

18   responses to the initial Office Action rejecting some claims

19   and confirming some others has been responded to by Apple,

20   and response to that has been made by SoftView, and we're

21   now awaiting the examiner's response to that, which could be

22   an action closing prosecution, could be a final rejection,

23   could be an interim action, and we should have that in a

24   relatively short period of time, when you look at how these

25   things normally transpire.  That is going to tell us a lot.

1              The second thing we're going to know in the next

2     couple of months is whether the ex parte reexaminations are

3     granted.  And this vector versus non-vector analysis that is

4     presented to your Honor will be joined further at the Patent

5     Office as a consequence of that.

6              So I sort of look at this from the standpoint of

7     what will we know three, six months down the road that we

8     don't know now that allows us to make a more informed judgment

9     about the wisdom of continuing a stay or not.  And I would

10    suggest that your Honor consider that as a possibility rather

11    than embarking on Markman and other issues as to which the

12    activity at the Patent Office may significantly influence

13    those proceedings.

14             Thank you.

15             THE COURT:  Thank you.

16             Are there any other defendants that wish to be

17    heard?  No?

18             Okay.  I'll hear from the plaintiff.

19             MR. LU:  Thank you, your Honor.  Samuel Lu for

20    SoftView.

21             I will begin by asking if further questioning or

22    presentation by me is necessary, if your Honor has

23    particular questions in mind.

24             THE COURT:  No.  I heard some things that give

25    me pause, so you should go ahead with your presentation.

```
 1                 MR. LU:  Sure.  I think the primary point that
 2    I would like to make is that this case is distinguishable
 3    from all of the other stay cases that are recited by the
 4    defendants.
 5                 Why is that?  Well, we have 14 out of the 20
 6    claims in the inter partes reexamination confirmed.  If you
 7    take a look at the history of what happened here, Apple is
 8    now on its third or fourth bite at the apple -- pun not
 9    intended.
10                 THE COURT:  Unavoidable.
11                 MR. LU:  Unavoidable.
12                 Apple filed a request for inter partes
13    reexamination and presented their A Team prior art.
14                 Of the claims that they requested reexamination
15    on, 90, the PTO said, you know what?  We don't see an issue.
16    We're not going to declare a reexamination on those 90 claims.
17                 Apple wasn't satisfied with that.  They petitioned
18    the PTO and said, look, you have to consider that.  Here are
19    the reasons why.
20                 The PTO said, okay, we'll take a look at it.
21    We'll grant your petition.  And what did the PTO say?  They
22    said we looked at your petitions, we looked at the prior
23    art, and we confirmed these claims.
24                 So Apple then decides we're going to take a
25    third bite at the Apple.  We're going to submit additional
```

1    briefing on these claims.  Even though the PTO has already

2    said, you know, in the first instance we're not going to

3    declare a reexamination, in the second instance we'll take a

4    look at your arguments and we'll confirm these claims and in

5    the third instance that is now under consideration in the

6    inter partes reexamination.

7             Now, what did Apple do?  Well, since the PTO

8    had already considered its A Team prior art, Apple then

9    submitted what I refer to as the B Team prior art:  the

10   stuff that was disclosed in its invalidity contentions

11   but that Apple didn't consider to be the prior art that

12   was worthy enough to submit in its original inter partes

13   reexamination application.

14            But Apple wasn't satisfied with that.  They

15   decided to take a fourth bite at the Apple by filing an ex

16   parte application using that same prior art.

17            So what we have here is a situation where the

18   PTO has already decided that 14 of the 20 asserted claims

19   in this case are confirmed.  They are patentable.  The new

20   prior art doesn't raise any invalidity issues in the PTO's

21   mind.  This distinguishes our case from many of the other

22   cases.  None of the other cases that I read made any

23   reference to allowed or confirmed claims being asserted in

24   the litigation.

25            THE COURT:  Is it true that they break down on

1    this vector/non-vector distinction, and that it's the vector

2    claims that are confirmed as of the moment and it's the

3    non-vector that are rejected?  Is that correct?

4               MR. LU:  That is correct, your Honor.  And as

5    I say, 14 of the 20 claims asserted contain the "vector"

6    limitation.

7               THE COURT:  But address directly the argument

8    that clearly "vector" is an important term here and you all

9    are fighting it out in front of the PTO which has far more

10   substantive knowledge of these things than I do exactly what

11   "vector" means in the context of these patents.  So doesn't

12   it follow that things will be simplified if I go ahead and

13   wait to see what the PTO does?

14              MR. LU:  Well, the PTO apparently has already

15   taken a position on what "vector" means.  If you take a look

16   at the PTO's response to Apple's inter partes reexamination

17   request, they do set forth its understanding of what "vector"

18   means.  It's doubtful, I cannot imagine the PTO going

19   further beyond that because they have already taken a look

20   at this issue not once but twice.

21              THE COURT:  So it sounds like you would

22   acknowledge there are some simplifying benefits from the

23   reexam, just that we have already gotten most of them.

24              MR. LU:  We have already gotten them.  Yes.

25              Now, one other point I would like to make on

1    Apple's reexamination request.

2            The prior art that is the subject of the ex

3    parte application, that is already before the PTO.  We

4    disclosed all of the prior art identified by Apple in

5    their invalidity contentions as well as the contentions

6    themselves in the inter partes reexaminations.  So that is

7    all part of the record that the PTO is considering and has

8    considered.

9            THE COURT:  Are you willing to agree not to

10   amend any of your claims in the reexam?

11           MR. LU:  We are willing to agree not to amend

12   any of the six that are still in the reexamination and being

13   considered.  The other 14 have been confirmed.  If the PTO

14   throws them into the reexamination again, we can concede on

15   that, too.

16           THE COURT:  Say that again.

17           MR. LU:  If the PTO throws those back into

18   reexamination, which we do not believe would occur, we would

19   agree not to amend those as well but only on the asserted

20   claims.

21           THE COURT:  So of the 20 claims currently

22   asserted against Apple.

23           MR. LU:  And to be asserted against the Android

24   defendants as well, yes.

25           THE COURT:  You agree not to seek any amendments

1      to any of those 20.

2                  MR. LU:  We agree not to seek any amendments to

3      those 20.

4                  THE COURT:  Is that something you have advised

5      the defendants of prior to just now?

6                  MR. LU:  No, I don't believe so.  I think it's

7      the first time the issue has been addressed head to head.

8                  THE COURT:  Right.  Okay.

9                  What is your estimate as to the timing of the

10     reexams?  How long are they likely to take if I go ahead

11     and -- well, how long do you think they're going to take?

12     Because that is a factor.

13                 MR. LU:  Right.  Well, the cases that we've

14     reviewed indicate estimates anywhere from four-to-eight years.

15     The fact of the matter is we now have two reexaminations both

16     on the same patent, and so assuming that they get consolidated

17     in front of the same examiner, then we would only -- you know,

18     we would have the estimated three to eight years.  Who knows,

19     it may end up in front of a different examiner.  So I don't

20     have an estimate.

21                 What is clear is this case has been pending

22     against Apple for two years, and Apple continues to delay by

23     filing serial reexaminations, you know, the inter partes

24     followed by the ex parte.  There is nothing to stop any of

25     the other defendants from filing reexaminations and we could

1    be in a situation where reexamination after reexamination

2    after reexamination is filed.

3              So my estimate is three and-a-half to eight years,

4    but it could be even longer if additional reexaminations are

5    filed because there is nothing stopping defendants from doing

6    so.

7              THE COURT:  All right.

8              MR. LU:  We should not be put in a situation

9    where SoftView's desire for relief and requests for relief

10   are stymied simply because parties continue to litigate this

11   case in a forum of their choosing the PTO by filing reexam

12   after reexam even after the PTO has considered their

13   arguments, even after the PTO has rejected their arguments.

14             THE COURT:  Now, it is true you are not a

15   competitor so help me best understand the prejudice to you

16   if I go ahead and stay this case.

17             MR. LU:  Well, the prejudice to SoftView is the

18   following.  Documents, you know, disappear, memories fade.

19   It's the typical.  It's a prejudice we articulated in our

20   briefs.  SoftView is also a small company, and in this

21   particular case, we have already seen some of that prejudice

22   befall SoftView.  For instance, one of the witnesses, for

23   instance, one of the witnesses we identified, a key witness

24   we identified in our initial disclosures, has passed away.

25   That is something that we anticipate would happen if this

```
 1   case gets stayed for four to eight years.

 2                THE COURT:  Okay.  Is there anything else you

 3   want to add?

 4                MR. LU:  I think that's it, unless the Court has

 5   any questions.

 6                THE COURT:  Just, what is your view on whether

 7   I'm making one decision or whether I'm making eight or nine

 8   different stay decisions?

 9                MR. LU:  I believe the Court should be making

10   one decision, especially given its statement with regard to

11   the notion of holding a single validity trial.  It would

12   not make sense to be staying one case and proceeding with

13   another case because that would make the Court's job of

14   consolidating for purposes of the invalidity trial impossible.

15                THE COURT:  Okay.

16                MR. LU:  Thank you.

17                THE COURT:  Thank you.

18                Mr. Krevitt, we made some news at least on

19   amendment.  Does that change your mind?

20                MR. KREVITT:  It tells me I should just keep

21   talking, your Honor, to see what further admissions I could

22   get.

23                THE COURT:  If only I had all day.

24                MR. KREVITT:  No.  It's helpful, that is true.

25   I want to address a few points that were made.
```

 1              I think, with respect, Mr. Lu's presentation

 2      confirms why we need a stay in this case.  Mr. Lu did not

 3      address in any way the points I made, nor did he deny that

 4      what happens in the reexamination with respect to the

 5      allowed claims -- we're not talking about the rejected

 6      claims now for the moment -- the allowed claims would be

 7      relevant to this court proceeding.

 8              Here is a promise I will make to your Honor.

 9      My Markman brief, whenever I file it, will have the word

10      "vector" in it.  Your Honor is going to have to construe

11      that term, that's a promise, unless your Honor declines to

12      do so.

13              That is the precise issue that the Patent

14      Office, which your Honor correctly said is the expert in

15      this area, looking at new prior art, that's the point,

16      looking at new prior art, that is the precise question that

17      the Patent Office is addressing.

18              I want to follow something Mr. Lu stated, and

19      it is critically important.  Mr. Lu has said the PTO has

20      already taken a position regarding the meaning of "vector."

21      And that is kind of true.  But here is the point.  Mr. Lu

22      and SoftView hasn't agreed to that position.

23              The further news I can make is if Mr. Lu comes

24      to this podium and says we agree to accept and be bound

25      by the current definition of "vector" that the Patent and

1    Trademark Office offered, that might be a different story,

2    because then there wouldn't be -- at least to some extent,

3    the risk of losing further development in SoftView's

4    positions might be mitigated.

5              SoftView is not going to take that position.

6    And the reason SoftView is not going to take that position

7    is several:

8              First, we're arguing that even under that

9    definition, the prior art should render the allowed claims

10   invalid.  SoftView is going to respond to that and explain

11   why the definition that the PTO has so far suggested is not

12   appropriate.

13             It's that very back and forth that your Honor

14   needs to conduct a fair and reasoned Markman process.  There

15   can be, again, no question that if the Patent and Trademark

16   Office is considering the question of what is a vector, that

17   will simplify the issues here when your Honor has to address

18   the question of what is a vector.

19             Mr. Lu also was, with respect, misleading with

20   respect to what has happened in the reexamination process.

21   It is not at all the case, your Honor, that Apple took one

22   bite at the Apple with its A Team prior art, and then took

23   another bite at the apple with its B Team.

24             Apple has engaged in a reexamination process

25   in which the Patent and Trademark Office rejected most of

1    the claims, allowed I think it's fewer than a fourth of the

2    claims, but some small minority of the claims, and said

3    that the claim, the prior art submitted is missing certain

4    things.  If you had these things, we might reject the claims.

5    It's missing this element and this element (indicating) and

6    it identified certain types of prior art that might have

7    those elements.

8              That is the prior art that Apple has now submitted.

9    It's not B Team prior art.  It's directly responsive to what

10   the Patent and Trademark Office identified as reasons that

11   they have not yet rejected the 90 claims that have so far been

12   allowed.

13             The simplification that will happen, your Honor,

14   at the Patent and Trademark Office isn't even limited to

15   prior art issues.  Of course, as your Honor is aware,

16   obviously the scope of the claims, what "vector" means, goes

17   directly to infringement issues.

18             But in this case, your Honor, it also goes to

19   112 issues, written description issues.  It's our view that

20   there is not a written description for the way that SoftView

21   is attempting to apply its claims, the way it is trying to

22   read the claims to cover Apple's products.  The position

23   that SoftView takes again with respect to the term "vector"

24   will be directly relevant to whether or not there is a

25   sufficient written description for that interpretation.  It

1    goes to damages.  It goes to a whole host of different issues.

2              The only other argument that I heard Mr. Lu

3    make was that SoftView would be prejudiced because of the

4    documents might go away.  Well, that can be dealt with

5    easily, your Honor.

6              First, Apple has already produced documents.

7    Second, it's source code.  That is what is alleged to

8    infringe here.  That can be preserved.  We will represent to

9    your Honor that any mechanism that will satisfy SoftView can

10   be employed to preserve that evidence.  And,

11             Finally, although I don't represent the Android

12   defendants, I believe Mr. Chu said earlier it's all open

13   source.  Everybody knows what it is.  So I believe that

14   SoftView is already in possession of all the evidence they

15   would need to prove infringement, if they can, with respect

16   to the Android defendants.

17             So, your Honor, for all of those reasons, it

18   indisputably simplifies, and there is nothing you heard

19   from Mr. Lu to the contrary.  Mr. Lu didn't even address the

20   question of the procedural posture in the case because there

21   is no dispute that this case is effectively at Square One by

22   virtue of SoftView's own conduct.

23             The prejudice we just addressed is substantial

24   for the defendants but it is minimal to the extent it exists

25   at all for SoftView.  A stay is appropriate.  And,

1          The final question you asked Mr. Lu that you

2     asked me also is timing.  Mr. Lu said four to eight years, I

3     think, or three to eight years.  That includes all appeals

4     that can be taken.  This Court need not fashion a stay that

5     puts this case on hold until the last en banc petition is

6     filed.  You could, courts have, fashion a stay that would

7     put this case in a stay until the activity at the Patent and

8     Trademark Office concludes.

9          The vast bulk obviously of the simplification,

10     the benefit of that simplification will be achieved.  And

11     as I said and explained earlier, the reexaminations are

12     moving very quickly, and there is no reason to believe, and

13     none has been provided to your Honor, there is no reason to

14     believe that the reexaminations at the Patent and Trademark

15     Office level cannot be wrapped up in a period far, far

16     shorter, virtually wrapped up in the next year or so.

17          So for all of those reasons, your Honor, and

18     in comparison to the cases in which this Court has denied a

19     stay, every one of which until the *Intellectual Ventures*

20     case, involved competitors -- every one.  Every one of which

21     had a trial date set -- every one.  When you compare the

22     case that your Honor has denied stay with the facts, the

23     circumstances, the status of this case, your Honor, and the

24     clear indisputable simplification that will result from the

25     reexamination process, it is our strong view, your Honor,

1    that a stay is appropriate in this case.

2              THE COURT:  Thank you.

3              Are there any other defendants?

4              MR. THOMPSON:  Just a 30 second point, your

5    Honor.

6              Mr. Lu raised the specter of more reexaminations

7    and newly added defendants might file reexaminations.

8              Should your Honor choose to enter a stay, we

9    would certainly agree not to file reexaminations.  This is

10   on behalf of Dell, but I believe the others would be of a

11   similar bent.

12             Thank you, your Honor.

13             THE COURT:  Thank you.

14             Is there anyone else?

15             MR. PARTRIDGE:  Your Honor, the patent holders

16   always argue the four-to-eight years which discounts what

17   is really happening in the Patent Office these days in light

18   of the AIA and the funding the PTO has received from the

19   Congress and hiring of new examiners and the like.  They are

20   moving things along so old data doesn't fit today's world.

21             And I would offer, your Honor, by comparison

22   what is likely to happen here.  If we had a trial in late

23   2013 in this case or even if it's as late as 2014, I don't

24   know when we will be able to fit on your calender, you can

25   consider post-trial motions associated with that for

1    resolution of those.  We're into 2014 in this case as well

2    without even going to appeals to the Federal Circuit.

3            So relative to what is happening in the Patent

4    Office, with statutory time limits that admittedly don't

5    apply to inter partes reexamination here and the ex parte

6    reexamination but which are influencing the speed at which

7    the Patent Office is moving, I think we will be far along in

8    the Patent Office before we actually get to trial in this

9    case.

10           THE COURT:  Okay.  Thank you.

11           Well, I am not prepared at this time to take

12   my inclination and turn it into an order.  By saying I was

13   inclined to deny the stay, I did not mean to suggest that

14   this was an easy decision.  It's a close call.  It's a

15   discretionary call.  And,

16           I think in light of the arguments made today,

17   particularly representations that some of the defendants

18   might be willing to some degree be estopped by what is

19   going on in the PTO as well as the representation from the

20   plaintiff for the first time that it would be willing to

21   agree not to seek amendment of any of the 20 asserted claims

22   in the reexam -- I'm sorry -- they would not seek amendment

23   in the PTO of the 20 claims that are asserted here, I think

24   it is best to give you all a chance to further meet and

25   confer, firm up your positions with your clients obviously,

1      figure out exactly what you can offer and what you can't

2      offer and then talk to one another on the same schedule that

3      I have outlined earlier with respect to proposing a schedule

4      going forward, assuming this case does go forward.

5              So, mind you, we will get a written order out

6      that tells you exactly what we're looking for from you, but

7      I don't think it would be appropriate for me to rule on the

8      stay at the moment in light of what I have heard here this

9      morning.

10             So let's move on, finally, to the whole bucket

11     of other motions.  We'll hear first from defendants on

12     those, please.

13             MR. FINN:  Thank you, your Honor.  Herbert Finn

14     on behalf of LG.

15             LG has moved to dismiss the indirect and

16     willfulness allegations based on SoftView's failure to plead

17     appropriate knowledge by LG.

18             At best, what SoftView has done is guess at what

19     LG knew or didn't know at the time before filing and after

20     filing.  And it's not permitted or at least it's not the

21     appropriate basis under *Iqbal* or *Twombly* to make the

22     allegation.

23             I know this Court says it was undecided.  Is

24     there any particular area that it has difficulties with that

25     it would like us to address?

1          THE COURT:  Well, you say it's a guess.  How

2      could a plaintiff ever, based on public information, prior

3      art discovery, know more than they allege with respect to

4      your clients?

5          MR. FINN:  That is precisely the situation here,

6      your Honor.  It's not based on public information.  It's based

7      upon what SoftView says is private information, discussions

8      that they have had with a third party.  And the third party

9      apparently never confirmed to SoftView that they told anyone

10     else about it.

11         THE COURT:  But certainly -- I say certainly

12     but with a question mark at the end.  Isn't it plausible to

13     think that the third party did tell your clients about the

14     discussions with SoftView?

15         MR. FINN:  No, your Honor.  I would actually say

16     it's unlikely.  I don't believe.

17         THE COURT:  Well, unlikely could still be

18     plausible.

19         MR. FINN:  Well, plausible isn't the standard.

20     It's a reasonable influence.

21         THE COURT:  Are you saying -- you are saying

22     by being a member of this aggregation service that it's

23     not a reasonable inference, that there would have been a

24     discussion between the aggregation service and your client

25     about the discussions with SoftView?

```
 1                 MR. FINN:  At this point, there is no evidence.
 2    There is nothing to support a reasonable inference that RPX
 3    aggregator talked to LG or any of the other defendants.
 4                 THE COURT:  So just to be clear, you are
 5    definitely taking the position it is unreasonable to infer
 6    that such discussions occurred?  That's not even one of the
 7    things that could possibly reasonably be expected to occur?
 8                 MR. FINN:  It is.  It is one of the things that
 9    could occur.
10                 THE COURT:  So on a motion to dismiss, why isn't
11    that enough?
12                 MR. FINN:  Because it has to be more than just
13    one of the things.  That is the plausible versus reasonable.
14    I think there is a distinction between plausible and
15    reasonable.  Plausible is anything could happen.  Reasonable
16    is it's likely to happen.  And that is not the circumstances
17    here.
18                 We've got a term sheet that indicates a
19    potential licensee.  Well, they're a potential licensee
20    because SoftView came to RPX and indicated the mobile unit,
21    the mobile world would be a potential licensee.
22                 So SoftView essentially told RPX who the
23    potential licensees were.  And, more importantly, I think if
24    you look at page 8 of SoftView's opposition, they indicate
25    that they are guessing.  Where they indicate that LG may
```

1    have had the knowledge, they don't know one way or the

2    other.

3              THE COURT:  But, again, so that they know that

4    you are a number of RPX.  They know they talked to RPX.  You

5    acknowledged I think it is at least a reasonable inference

6    that RPX would have told LG about their discussions.  So how

7    could a plaintiff ever know more than that?

8              They certainly don't have to prove to me today

9    here is the e-mail.  Here is the conversation at which RPX

10   definitely told LG.  If they can't find it in discovery,

11   then you move for summary judgment and presumably you win

12   summary judgment.  Isn't that how it works?

13             MR. FINN:  Well, your Honor, I think they have

14   to plead a little more.  They haven't taken that step that

15   RPX has told LG.

16             THE COURT:  So are you saying unless they can,

17   in good faith, you know, overcome Rule 11 and allege that

18   they know for sure that RPX told LG, that just cannot be a

19   basis for denial?

20             MR. FINN:  Your Honor, they have to at least

21   make the allegation and they haven't done that.  They

22   haven't made the allegation that RPX told LG or any other

23   member of the consortium of the aggregator that they were

24   told anything about the patents or the patent families.  All

25   they have established is that they've had discussions with

1    this third party, RPX.

2              THE COURT:  That's my focus seems to be the

3    pleading standard.  I mean we're very early on and the

4    pleadings standard seems to be a big problem for you.

5              MR. FINN:  Obviously, we disagree.  We don't

6    think they have adequately pled.  We believe the case law

7    requires more than just a disconnected step of we've talked

8    to a third party and you're somehow associated with that

9    third party without the allegation that that third party is

10   told anything about the patents or the information that that

11   third party received.

12             THE COURT:  Now, they also allege that you

13   received service of the second amended complaint.  Do you

14   agree that at least from the time after service of that

15   complaint that they have adequately alleged your knowledge

16   of the patents in suit?

17             MR. FINN:  Well, at that point they have

18   adequately alleged knowledge of the patents in suit.  However,

19   I don't believe that is the appropriate time period to look

20   for indirect infringement.  You should be looking at the

21   prefiling.  There should be no distinction as to why knowledge

22   during the course of the case would change the situation.  In

23   fact, in this case, the second amended complaint is the

24   initial complaint that was received by LG.

25             So going on, you are essentially penalizing LG

1    for just continuing its business practices after having the

2    knowledge to go on with infringement without having put any

3    onus on SoftView to take steps to correct that.

4              THE COURT:  So just looking at the time frame,

5    I think it was October of 2011, the time after which you

6    were first served with a complaint, you disagree that the

7    plaintiff can seek to recover for indirect infringement and

8    willful infringement that occurred after that date?

9              MR. FINN:  That is correct, under *Xpoint* and

10   Avacroft (phonetic).

11             THE COURT:  And is it because of lack of

12   knowledge or is it because of some other failing in the

13   claim?

14             MR. FINN:  Well, it's when do you stop looking

15   at the knowledge.  And our position is that the knowledge

16   has to be acquired prefiling.

17             THE COURT:  All right.  I think they also

18   allege, with respect to your client, all the media publicity

19   that apparently their original suit engendered and that that

20   somehow put you on notice.  Address that.

21             MR. FINN:  Well, that is even more specious than

22   the relationship we have with RPX.  There is an allegation

23   that there was this widespread media blitz.  There is no

24   allegation as to what is in the media blitz.  There is no

25   allegation that LG even had knowledge of the articles

1    identified in the complaint, let alone read them, looked up

2    the patents and went to see what there was there.

3                    Furthermore, under *EON v FLO TV*, which very

4    clearly said that merely being in the industry doesn't give

5    rise to gaining knowledge by any particular entity.  I think

6    it's unfair just to say that, well, there is advertising

7    out there that has information on it and you should become

8    accustomed to it and read it and do some due diligence on it.

9                    More importantly, the publicity that went on was

10   about the Apple OS which is an entirely different operating

11   system than what LG is being accused of infringement through.

12                    THE COURT:  Is there anything else you want to

13   say?

14                    MR. FINN:  No.  That about covers it, your

15   Honor.  Thank you.

16                    THE COURT:  Thank you.

17                    Are there other defendants?

18                    MR. THOMPSON:  Yes, your Honor.  Rod Thompson

19   again for Dell.  Two discrete points for Dell.

20                    With respect to the RPX allegations, we concur

21   with LG's arguments but Dell has an even stronger position.

22   The allegation against Dell is that Dell became a member of

23   RPX in April of 2010, and that is in paragraphs 41 and 59 of

24   the fourth amended complaint.

25                    The alleged knowledge and the negotiation

1      discussions was a year earlier, in May of 2009.  So not only

2      are they asking you to make the implausible assumption that

3      RPX tells all its members everything, they're asking you

4      to assume that RPX tells all its members, including new

5      members, a year later what happened a year before.  That

6      simply implausible.

7                    THE COURT:  Implausible and unreasonable.

8                    MR. THOMPSON:  And unreasonable.

9                    THE COURT:  To some extent if this is an unfair

10     question, you can tell me that.  You can't represent here

11     that if I disagree and you take discovery that we're not

12     going to find an e-mail or a witness from RPX that says, oh,

13     yeah, that is what we do.  That is what we did in this case.

14                    MR. THOMPSON:  I have not undertaken that search

15     but, your Honor, there is a fishing expeditions everyday.

16                    THE COURT:  I suppose you would say something

17     can still be implausible even if it turns out to be untrue.

18                    MR. THOMPSON:  It can be highly unlikely, yes.

19                    THE COURT:  Is there anything else?

20                    MR. THOMPSON:  I believe your Honor asked about

21     the *EON* and *Xpoint* cases and referred to wilfulness as well

22     as indirect infringement.  I think those cases and the

23     *Walker* case as well are careful not to disturb some of the

24     law on willfulness.

25                    You need pre-suit knowledge.  That just simply

1    following a complaint against the defendant is not going to

2    put that defendant on notice of the patent for purposes of

3    willfulness.  The *Seagate* case is quite clear on that, your

4    Honor.

5              THE COURT:  Thank you.

6              MR. THOMPSON:  Thank you.

7              MR. ROSENBERG:  Your Honor, Stuart Rosenberg

8    from Gibson Dunn & Crutcher on behalf of AT&T.  I'd like to

9    quickly address the allegations of pre-suit knowledge

10   against AT&T because they're different than the allegations

11   against the Android manufacturers.  They don't concern this

12   third-party patent aggregation company.

13             And I think also it's important to note at the

14   outset that AT&T is in a different position having been in

15   the case since the first complaint.  There has been document

16   discovery of AT&T and so the questions about what SoftView

17   might find, might be able to uncover through discovery, they

18   already had some opportunity to do that.

19             There are three allegations for how AT&T

20   allegedly acquired knowledge of the patents in suit before

21   being sued:

22             The first is that because a patent issued to

23   Bell South, not AT&T, that Bell South, which is allegedly a

24   related company, cites on its face a 2002 publication about

25   not the patents of suit but of the parent application for

1    the applications of the parent in suit, that therefore

2    somehow that put AT&T on notice of the patents in suit which

3    didn't issue until the '353 patent, didn't issue until 2008.

4            In fact, the application for it wasn't even filed

5    until 2005, which was three years after this publication was

6    cited in the Bell South patent, a year after the citation

7    itself which happened during the course of prosecution.

8            So we just think that the chain of inferences

9    to get from that one citation in the Bell South patent to

10   AT&T's knowledge of an issued patent that wasn't cited is

11   just too tenuous and implausible.  Unreasonable, not

12   plausible.

13           The second allegation in the complaint about

14   AT&T's pre-suit knowledge is that AT&T has some unspecified

15   "connection" to Mr. Rohrbach, who is one of the named

16   inventors on the patent in suit.  This is at paragraph 40 of

17   the amended complaint.

18           We said in our opening brief for this motion

19   to dismiss that SoftView has failed to identify what this

20   alleged connection is, no who, what, where, when, and why,

21   and that therefore that doesn't supply us as an allegation

22   for pre-suit notice.

23           SoftView didn't address that contention at all

24   in its response brief and we believe that that waives that

25   argument that it would suffice as a plausible allegation of

1    pre-suit knowledge.  And,

2              Finally, SoftView's complaint alleges that AT&T

3    had pre-suit knowledge of the patents in suit because of its

4    "relationship with Apple" and the fact that AT&T was at one

5    point the exclusive carrier for the iPhone before other

6    carriers got into the business of selling the iPhone.

7              We don't think that is plausible because, among

8    other reasons, SoftView has now had opportunity to take

9    discovery that Apple and AT&T and if there were anything to

10   support that chain of inferences, that because SoftView told

11   Apple about the patent in-suit before filing, that therefore

12   Apple must have told AT&T, there would be something to put

13   in the complaint or at least some allegation on information

14   and belief there was such a conversation, but instead all

15   the complaint alleges is that Apple knew we because we told

16   Apple.  Apple and AT&T had a relationship.  Therefore, AT&T

17   must have known, and we don't think that is sufficient.

18             THE COURT:  Assume for the moment that I agree

19   with you.  Why should the relief not be not to give them a

20   chance to amend their complaint to see if they can bulk up

21   the knowledge and intent allegations as opposed to just

22   dismissing with prejudice?

23             MR. ROSENBERG:  Two reasons, your Honor.  The

24   first is since they already had the case pending for long

25   enough to take that discovery, we feel like if they had been

1    able to find it, they should have been able to.  They had

2    the opportunity, and having come up with it, it's now late

3    enough in the case, that it should be in the complaint if

4    they have it.

5              Second is, with respect to willfulness, we

6    think in particular the fact that the Federal Circuit has

7    explained that you need pre-suit knowledge in order to

8    maintain the case for willfulness, absent extraordinary

9    circumstances; and that they haven't come up with anything

10   yet means that issue should be put to rest and shouldn't be

11   hanging on AT&T's head when there is no foundation for it.

12             THE COURT:  And it seemed with respect to AT&T

13   that there was some wait at the December 2008 date?  I'm not

14   quite sure what the relevance of that was.

15             MR. ROSENBERG:  I believe that is what the '353

16   patent issued and that is why that date.

17             THE COURT:  That is why that date is mentioned.

18             MR. ROSENBERG:  That date is mentioned several

19   times.

20             THE COURT:  All right.  Thank you very much.

21             MR. ROSENBERG:  Thank you.

22             THE COURT:  Are there any other defendants?

23             MR. WILLIAMS:  Yes, your Honor.  Eliot Williams

24   for Huawei, one of the Android defendants.  I just want to

25   make one more point about this RPX issue.  Actually, two

1     points.

2                 First, the allegations as to Huawei are slightly

3     different.  They are probably the smartest system of any of

4     the RPX-related allegations in the fourth amended complaint.

5     Their plaintiff is trying to rely solely on the fact we were

6     a member of RPX and the date disclosed to RPX.  So there is

7     no other fact alleged that would lead the Court to draw the

8     inference that it's asking to draw, which is that we were

9     then somehow provided with notice of this particular patent.

10                The other point I wanted to make, we do cite in

11    our joinder brief some case law that suggests the inference

12    they want you to draw which is to impute the knowledge of

13    RPX to Huawei is legally impermissible.  So you cannot just

14    impute knowledge from RPX to Huawei because we're a member

15    of this organization.  So, therefore, they need to make this

16    allegation there was actually notice provided.  That is an

17    allegation which they are unwilling and unable to do because

18    it's not anywhere in the complaint.

19                So for that additional reason, we think that

20    what the complaint is asking to do is really to violate the

21    rules in *Twombly* and *Iqbal*, and they have to get above the

22    speculative level they're asking to make a speculation that

23    is legally impermissible.  For that reason, we think those

24    allegations are insufficient to show the notice.

25                THE COURT:  Now, Rule 9(b) does not apply here;

1    correct?  9(b) applied to fraud allegations; correct?

2              MR. WILLIAMS:  Correct.  Yes.

3              THE COURT:  Now, even under Rule 9(b), you can

4    allege knowledge generally, can't you?

5              MR. WILLIAMS:  Well, there would have to be an

6    allegation of how they -- in a Rule 9(b) case where you are

7    alleging fraud, there would have to be some allegation as to

8    what the fraudulent conduct was, something specific.  Here,

9    there is nothing specific about notice.

10             I mean if it's true that RPX provided notice

11   to Huawei that alleged that, we'll fight it out.  We may

12   disagree, we'll prove they're wrong, and we'll move for

13   summary judgment, but they haven't alleged that.  They

14   refused to allege that.  They're asking the Court to make

15   this next step for them which we think is just legally

16   impermissible.

17             THE COURT:  But I do have to draw a reasonable

18   inference in their favor; right?

19             MR. WILLIAMS:  Right.  As I'd said, I think they

20   are asking you to draw one that is legally impermissible

21   which is to impute the knowledge.  If there was an actual

22   communication, let's test that out, let's find that out on

23   discovery, and we'll deal with that on summary judgment, but

24   it's not being engaged and since we're here on a pleading

25   motion, they need to make the allegation if that is the

1    direction they want to take this case on.

2              THE COURT:  Okay.  Thank you.

3              Is there anybody else?

4              MR. SHAW:  Good morning, your Honor.

5              THE COURT:  Good morning.

6              MR. SHAW:  John Shaw for HTC.

7              I originally intended to come up to talk about

8    one factual difference for HTC but you asked a question

9    which I can give a little more information on, or two of

10   them.  One on dismissal versus allowing repleading.

11             The Third Circuit in recent years has allowed

12   and affirmed the District Courts dismissing after there have

13   been at least one amendment already on grounds that you need

14   to control the docket and put plaintiffs to their proofs and

15   their pleadings early on.  So there is authority for you to

16   do it, although you certainly have discretion to go in

17   either direction.

18             The different fact for HTC was that HTC filed a

19   DJ action in Washington after the motion to amend was made

20   before the complaint was actually filed.  I was going to

21   comment on that basically to say that that puts the DJ in

22   the same position as getting served with a complaint.

23             But your Honor then asked the question:  Is

24   filing the complaint enough to sustain willful infringement

25   after the complaint is filed?  I think the answer there

1    should also be no.

2              Now, people have mentioned *Seagate* up here and

3    the reason it's no is this:  *Seagate* came out in a time when

4    there was a lot of debate about opinions of counsel and what

5    is the scope of discovery of opinions of counsel, including

6    trial counsel.

7              *Seagate* in that context tried to draw the line at

8    the complaint to cut all those issues out and, put a different

9    way, in which is we can test objective recklessness about

10   whether or not the motion for preliminary injunction was

11   filed.

12             *Seagate* now adds *Twombly* into the mix looking

13   for specific facts and simply filing the complaint and

14   having the complaint on file doesn't do anything for

15   specific facts other than knowledge.  It doesn't show or

16   plead anything about objective recklessness and conduct or

17   for the inducement of infringement, anything about specific

18   intent to cause the acts of infringement.

19             That is why simply filing the complaint should

20   be the cutoff date for those and, while it may be the

21   knowledge component, doesn't meet the rest of pleading some

22   fact that is plausible to show those two causes of action.

23             THE COURT:  Okay.

24             MR. SHAW:  Thank you.

25             THE COURT:  Thank you very much.

1          MR. BOICE:  One more very briefly, your Honor.

2    Bill Boyce from Kilpatrick Townsend on behalf of Motorola

3    Mobility.  Just to a factual issue.

4          At the time that the disclosure was allegedly

5    made to RPX of the patent, the '353 patent and the patent

6    application, Motorola was not a member of RPX.  It was July

7    of 2009 when that disclosure was made.  Motorola was not a

8    member of RPX until 2010, over a year later from that.

9          So the allegation is at the disclosure, it was

10   contemplated that RPX would sublicense these patents or license

11   these patents to potential parties.  Then on information and

12   belief, they say the allegation is that, well, they must have

13   then talked to Motorola as a potential sublicensee.  Again,

14   you are piling speculation on speculation here, and that is

15   not adequate to create an inference of actual knowledge at

16   that time.

17          Thank you.

18          THE COURT:  Thank you.

19          MR. DORFMAN:  To finish up, good morning, your

20   Honor.

21          THE COURT:  Yes.

22          MR. DORFMAN:  Michael Dorfman from Katten Muchin

23   Roseman for Kyocera.

24          I wanted to point out, this was in our papers

25   and SoftView agrees, Kyocera was not a member of RPX, so the

 1    only allegations of prefiling notice relating to Kyocera

 2    relates to publications identified in SoftView's complaint.

 3    For the reasons in LG's motion and argument, we believe that

 4    those are insufficient.

 5              THE COURT:  Okay.  Thank you very much.

 6              MR. BOICE:  Thank you.

 7              THE COURT:  Is that it from defendants?

 8              Okay.  Let's hear from plaintiff.

 9              MR. LU:  Your Honor, Sam Lu again.

10              I just wanted to point out one case that was

11    cited in LG's reply.  Other than that, I'm happy to stand on

12    our papers unless the Court has questions that it would like

13    to follow-up.

14              The case that I wanted to point out is that LG

15    cited the *Anascape* case for the proposition that postfiling

16    activity, postfiling notice based on patent complaint

17    couldn't give rise to willfulness.

18              Now, we have address that in the *DataQuill* case

19    and the other cases that we cited.  But even this case cited

20    by LG does not stand for the proposition that postfiling

21    knowledge is an absolute bar to a finding of willfulness.

22              What *Anascape* says is "the Court does not oppose

23    a categorical rule that lack of a motion for preliminary

24    injunction automatically bars post-suit willful infringement

25    but rather finds that in these particular circumstances,

1    Anascape's post-suit conduct coupled with lack of any

2    evidence of pre-suit notice of the '700 patent establishes

3    that there is no willful infringement by either defendant."

4         So this was a motion for summary judgement that

5    was brought in the *Anascape*.  But even then, the Court made

6    quite clear, notwithstanding LG's citation to it in the

7    briefs, that there was no absolute bar to a finding of

8    willful infringement based solely on postfiling conduct.

9         THE COURT:  If I conclude that all that you

10   have properly alleged is knowledge from the service of the

11   complaint, just assume that for the moment, then you

12   acknowledge you can't recover for any alleged indirect or

13   willful infringement prior to initiation of the suit?  Do

14   you concede that?

15        MR. LU:  Yes, I would concede that.

16        THE COURT:  Then break down for me, again -- and

17   you just alluded to it but I need you to be more precise for

18   me -- what is it that you think knowledge of the suit just

19   arising from the service of the complaint, how does that

20   support indirect infringement and willful infringement for

21   the post-suit period?

22        MR. LU:  Okay.  So for indirect infringement,

23   the infringer's activities continue after the complaint is

24   filed.  And Judge Robinson, in deciding the *Walker Digital*

25   case, indicated that "if a complaint identifies for purposes

1   of Rule 8 the patent at issue and the allegedly infringing

2   conduct, the defendant's receipt of the complaint and

3   decision to continue its conduct despite the knowledge

4   gleaned from the complaint satisfies the requirements of

5   *Global Tech* and therefore sufficiently pleads indirect

6   infringement."

7            In other words, they receive knowledge of the

8   patent as of the date the complaint was served.  They

9   continue to engage in an infringing activity for which

10  damages are available and for which the claim of direct

11  infringement is available.  That gives SoftView the right

12  to recover for those sort of damages.

13           THE COURT:  And then on willfulness.

14           MR. LU:  Well, on willfulness it's a little

15  bit different question.  And the issue -- and I may have

16  misspoke a little bit earlier.  The issue really that is

17  that the defendants are arguing that it is an absolute bar

18  to any finding of willful infringement if you can't show

19  knowledge of the patent prior to the filing of the complaint.

20           I have not looked into the issue of whether --

21  I have looked into the issue that if you can show knowledge

22  of the patent after the filing of the complaint and that

23  is based on postfiling conduct, that is sufficient for a

24  finding of willful infringement going forward.  That is what

25  is in the cases that we cited, including the *Anascape* case

1    cited by LG.

2              THE COURT:  All right.  Then come to the issue

3    of knowledge and what is reasonable to infer from your

4    pre-suit allegations, specifically, with RPX.  Why not come

5    out and allege that they actually got knowledge from RPX?

6              MR. LU:  Your Honor, as pointed out, there are

7    specific requirements under Federal Rule of Civil Procedure

8    11.  And we are nothing if not adamant about following that.

9    And as a result of that, we know certain facts that we can

10   confirm.  There are other facts that we believe exist but we

11   do not have proof out there.

12             Your Honor identified the issue which is the

13   following:  How would a plaintiff ever prove up the knowledge

14   of a defendant, accused infringer if they have to plead those

15   facts before they had the opportunity to take discovery?  And

16   that is what the defendants are effectively attempting to do

17   today.  They're attempting to make us go through the proof

18   that would otherwise be required in a motion for summary

19   judgment but in the context of a motion to dismiss.

20             We haven't yet had the opportunity to take

21   discovery, including from AT&T, on the issues that the

22   AT&T lawyer addressed.  If we had the opportunity to take

23   discovery, including discovery from RPX, for instance, or

24   discovery for the AT&T and Apple representatives, business

25   representatives who address patent issues between themselves

1    and we were unable to get confirmation as such communications

2    took place, then it would be perfectly appropriate for a

3    motion for summary judgment to be brought.

4            But this is a motion to dismiss.  We have made

5    allegations that are reasonable, more than plausible and

6    that is all that's required.  Because the Court, under a

7    motion to dismiss, in deciding a motion to dismiss, must

8    take our allegations to be true and see what reasonable

9    inferences can be draw from that.

10           It is imminently reasonable for the notion that

11   RPX, a patent aggregation firm whose business is approaching

12   members of the firm and saying, look, here is what you got

13   for your money.  We're able to get these patents.  It is

14   eminently plausible that they had a discussion regarding the

15   '253 patent and we want to take discovery and confirm that.

16           It is also plausible that RPX, a company whose

17   business model includes recruiting new members by saying

18   here is what we have in the works, here is the IP that we

19   available, here is what we can get, would have communicated

20   to those members the fact that they were in discussions with

21   SoftView and the '353 patent.

22           THE COURT:  Okay.  Is there anything else?

23           MR. LU:  Not unless your Honor has further

24   questions.

25           THE COURT:  No, you answered my questions.

```
 1                MR. LU:  Thank you.

 2                THE COURT:  All right.  Any defendants?

 3                MR. FINN:  Yes, your Honor.  I'll start where

 4    Mr. Lu just left off.

 5                Mr. Chu, when we were arguing the 299 motion,

 6    made a very pointed statement and said that he hasn't had

 7    any of the defendants stand up and say in a very clear

 8    statement that they didn't have knowledge of these patents

 9    prior to filing.

10                Frankly, that is all defendants are asking for

11    right now is a very clear allegation in the complaint that

12    LG and the other defendants, on information and belief,

13    received the information from RPX.  SoftView has not wanted

14    to say that.  I don't know why, but they're unwilling to do

15    that anywhere in the complaint.

16                They've had many, many opportunities to say they

17    talked to RPX.  RPX knew about the patents.  RPX turned

18    around and told the various members not only that we had

19    these discussions but about the patents.  SoftView hasn't

20    done that.  It's a deficient pleading.

21                With respect to Mr. Lu's comment on *Anascape* and

22    willfulness and whether or not it is possible to have a

23    willful case after filing, having knowledge after filing,

24    yes, it's not LG's position that Seagate is an absolute

25    bar to a willfulness allegation based upon postfiling
```

1    information.

2            *Seagate* itself says under extraordinary

3    circumstances that could happen.  We don't have those

4    circumstances here.  And, in fact, Judge Robinson, in the

5    Adeline (phonetic) case, points out, a case they want to

6    rely on for indirect infringement, points out that typically

7    in these circumstances, it's all prefiling knowledge that is

8    to be considered.

9            To the extent that SoftView complains that they

10   didn't bring a preliminary injunction or didn't take any

11   action as LG and some of the other defendants would ask them

12   to take, that would essentially turn *Seagate* on its head.

13   *Seagate* says you will get prefiling absent the extraordinary

14   circumstances, the extraordinary circumstances going for the

15   preliminary injunction and doing what they need to do to try

16   to stop the early infringement allegations and stop the

17   alleged infringer from continuing on.

18            THE COURT:  Thank you.

19            Are there other defendants?

20            MR. ROSENBERG:  One point very briefly, your

21   Honor on AT&T.

22            I heard Mr. Lu say that he believes SoftView

23   hasn't had an opportunity to take discovery of AT&T on these

24   issues.  I frankly disagree just as a matter of how long the

25   case has been pending against AT&T.  We haven't received a

1    deposition notice, written document requests, interrogatories,

2    But there is nothing to stop SoftView from taking the discovery

3    sought.  Thank you.

4              THE COURT:  Thank you.

5              Is there anyone else?

6              Okay.  Well, I will take these motions to

7    dismiss under advisement.  As I indicated, we'll get a

8    short written order out memorializing the guidance I gave

9    you earlier and directing you to give us some further

10   submissions.

11             Is there anything else that plaintiffs wish to

12   raise at this time while we're all here?

13             MR. CHU:  No, your Honor.

14             THE COURT:  Defendants, anything else?

15             MR. PARTRIDGE:  No, your Honor.

16             MR. FINEMAN:  No, your Honor.

17             THE COURT:  All right.  That looks like a no.

18   Thank you.  We will be in recess.

19             (Hearing ends at 12:14 p.m.)

20

21

22        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

23

24                        /s/ Brian P. Gaffigan
                        Official Court Reporter
25                        U.S. District Court