# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOFTVIEW LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| APPLE INC.; AT&T MOBILITY LLC; | : |
| DELL INC.; HTC CORP.; HTC | : |
| AMERICA, INC.; HUA WEI | : |
| TECHNOLOGIES CO., LTD.; | : |
| FUTUREWEI TECHNOLOGIES, INC.; | : |
| KYOCERA CORP.; KYOCERA | : |
| WIRELESS CORP.; LG | :    Civil Action Nos. 10-389 |
| ELECTRONICS, INC.; LG | :    (CONSOLIDATED) |
| ELECTRONICS USA, INC.; | : |
| LG ELECTRONICS MOBILECOMM | : |
| U.S.A., INC.; MOTOROLA MOBILITY | : |
| LLC; SAMSUNG ELECTRONICS CO., | : |
| LTD.; SAMSUNG ELECTRONICS | : |
| AMERICA, INC.; and SAMSUNG | : |
| TELECOMMUNICATIONS AMERICA, | : |
| LLC, | : |
| | : |
| Defendants. | : |

---

Steven L. Caponi, BLANK ROME LLC, Wilmington, DE
Morgan Chu, Samuel K. Lu, IRELL & MANELLA LLP, Los Angeles, CA

> Attorneys for Plaintiff.


Richard L. Horwitz, David E. Moore, POTTER ANDERSON & CORROON LLP, Wilmington, DE

> Attorneys for Defendants Apple Inc. and AT&T Mobility LLC.

Jack B. Blumenfeld, Rodger D. Smith II, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

> Attorneys for Defendants AT&T Mobility LLC and Motorola Mobility LLC.

Frederick L. Cottrell, III, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

> Attorney for Defendants Huawei Technologies Co., Ltd. and Futurewei Technologies, Inc.

John W. Shaw, David Fry, SHAW KELLER LLP, Wilmington, DE

> Attorneys for Defendants HTC Corp. and HTC America, Inc.

Adam W. Poff, Monté T. Squire, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, DE

> Attorneys for Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC.

Gregory E. Stuhlman, GREENBERG TRAURIG, LLP, Wilmington, DE

> Attorney for Defendants LG Electronics, Inc., LG Electronics USA, Inc., and LG Electronics Mobilecomm U.S.A., Inc.

John C. Phillips, Jr., Megan C. Haney, PHILLIPS, GOLDMAN & SPENCE, P.A., Wilmington, DE

> Attorneys for Defendants Kyocera Corp. and Kyocera Wireless Corp.

Steven J. Fineman, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE

> Attorney for Defendant Dell Inc.

---

## MEMORANDUM OPINION

September 4, 2013
Wilmington, Delaware

STARK, U.S. District Judge:

Pending before the Court is the issue of claim construction of various disputed terms found in U.S. Patent Nos. 7,461,353 (the "'353 patent") (D.I. 467 Ex. 1) and 7,831,926 (the "'926 patent") (D.I. 467 Ex. 2) (collectively, the "patents-in-suit").

## I.    BACKGROUND

On May 10, 2010, SoftView LLC ("Softview" or "Plaintiff") filed this patent infringement action.  (D.I. 1)  The defendants are Apple Inc., AT&T Mobility LLC, Dell Inc., HTC Corp., HTC America Inc., Hua Wei Technologies Co., Ltd., Futurewei Technologies, Inc., Kyocera Corp., Kyocera Wireless Corp., LG Electronics, Inc., LG Electronics USA, Inc., LG Electronics Mobilecomm U.S.A., Inc., Motorola Mobility LLC, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC, and Sony Ericsson Mobile Communications (USA) Inc. (collectively, "Defendants").[1]  The patents-in-suit relate to a system and method for allowing web pages to be rendered, zoomed, and panned in a web browser.

The parties completed briefing on claim construction on October 22, 2012.  (D.I. 478, 479, 499, 500)  The Court held a *Markman* hearing on January 10, 2013.  (D.I. 675) (hereinafter "Tr.")

## II.   LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to

---

[1]Softview and Sony Ericsson Mobile Communications (USA) Inc. entered into a stipulation and order of dismissal on May 3, 2013.  (D.I. 985)  The dismissal also applies to AT&T Mobility LLC with respect to products of Sony Ericsson Mobile Communications (USA) Inc.  (*Id.*)

1

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Construing the claims of a patent presents a question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a

2

presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to

the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).

## III.   CONSTRUCTION OF DISPUTED TERMS[2]

### 1.   "scalable content"

a.   <u>Plaintiff's Proposed Construction</u>: "content capable of being rendered at multiple zoom levels."

b.   <u>Defendants' Proposed Construction</u>: "data in a format generated after pre-rendering that provides the layout, functionality, and design of the web page at multiple user-selected scale resolutions."

"Pre-rendering": "the process of blocks 150-154 of Figure 5 (*see* '353 15:43-17:41)."

c.   <u>Court's Construction</u>: "content capable of being rendered at multiple zoom levels."

Plaintiff argues that Defendants' construction improperly limits the term by importing three limitations: the data used (1) is generated after pre-rendering; (2) provides the layout, functionality, and design; and (3) is scaled to user-selected resolutions.

The Court finds no basis for incorporating the pre-rendering process limitation, which is "a commonly performed" process in the prior art. ('353 patent col. 17 ll. 31-34; Tr. at 59) Similarly, the Court finds no reason to incorporate "the layout, functionality, and design of the web page" limitation, as this language is already contained in the independent claims containing the term scalable content. (*See, e.g.*, '353 patent col. 22 ll. 36-40; col. 25 ll. 48-57; col. 29 ll. 1-9; col. 32 ll. 9-11, 38-41; col. 35 ll. 13-20; col. 39 ll. 33-35; col. 40 ll. 7-10; col. 43 ll. 29-35; col. 48 ll. 27-30)

Turning to the third dispute, the parties agree on the existence of ***multiple*** zoom

---

[2]The '353 and '926 patents share a common disclosure. Citations to the specification of the '353 patent are intended also to cover the corresponding portions of the '926 patent.

The parties agreed on several constructions. (*See* D.I. 496 at 1-2; D.I. 612 at 1; D.I. 613-2 at 1) The Court will adopt these agreed-upon constructions.

levels/user-selected scale resolutions.  (D.I. 499 at 4 n.3; D.I. 500 at 7)  The term "scalable" is used throughout the specification as "zoomed."  (*See, e.g.*, '353 patent col. 2 ll. 24-25; col. 4, ll. 5)  Furthermore, in the inter partes reexamination, scaled and zoomed are used interchangeably. (D.I. 478 Ex. F at FH_DEF000018)  Though the specification also supports Defendants' construction by suggesting that content can be altered at "various user-selectable scaled resolutions" ('353 patent col. 9 ll. 8-10), claim 2 – which depends from claim 1 – specifically claims "user-selectable" content.  The Court is not persuaded it should read a "user-selectable" limitation into "scalable content."

    **2.**    **"scalable / scaling / scaled"**

        a.    <u>Plaintiff's Proposed Construction</u>: "capable of being rendered at multiple zoom levels / rendering at multiple zoom levels / rendered at multiple zoom levels."

        b.    <u>Defendants' Proposed Construction</u>: "scaling" / "scaled": these terms have a plain and ordinary meaning and do not need to be construed.

However, if the Court chooses to construe these terms, the following constructions should be used:

"scaling": "setting to a user-selected resolution."

"scaled": "set to a user-selected resolution."

"scalable": "defined in the context of 'scalable content' and 'scalable vector-based content.'"

        c.    <u>Court's Construction</u>: "capable of being rendered at multiple zoom levels / rendering at multiple zoom levels / rendered at multiple zoom levels."

The dispute over these terms is essentially the same dispute that the Court resolved with respect to the prior term.  Again, the Court adopts Plaintiff's proposal.

3.     **"translating"**

   a.     <u>Plaintiff's Proposed Construction:</u> this term has a plain and ordinary
          meaning and does not need to be construed.

          However, if the Court chooses to construe this term, the following
          construction should be used:

          "converting."

   b.     <u>Defendants' Proposed Construction:</u> "converting the format of."

   c.     <u>Court's Construction:</u> "converting."

The Court concludes that the term does not require the additional language – "the format

of" – proposed by Defendants.  The claim language states that "the HTML-based Web content

from its original format" is translated into "scalable content." ('353 patent col. 22 ll. 34-36)  As

the surrounding claim language makes clear that the original format is translated into scalable

content, the language "the format of" is unnecessary.

4.     **"processing [the] HTML-based Web content to produce scalable content"**

   a.     <u>Plaintiff's Proposed Construction:</u> "processing [the] HTML-based Web
          content to produce content capable of being zoomed in or out."

   b.     <u>Defendants' Proposed Construction:</u> "converting [the] Web content from
          its HTML format to a scalable content format."

   c.     <u>Court's Construction:</u> "converting [the] Web content from HTML to a
          scalable content."

The Court declines to adopt Defendants' use of "format" in this claim term.  The Court

further concludes that "processing . . . to produce," is used interchangeably with "translating."

(*Compare* '353 patent col. 22 ll. 34-36 ("translating . . . the HTML-based Web content . . . into

scalable content"), *with id*. at col. 25 ll. 46-47 ("processing HTML-based Web content to

7

produce scalable content")) Hence, the Court will construe "processing" as "converting," just as it has construed "translating."

    **5.**    **"format"**

        a.    <u>Plaintiff's Proposed Construction:</u> this term has a plain and ordinary meaning and does not need to be construed.

            However, if the Court chooses to construe this term, the following construction should be used:

            "a particular way that information is encoded."

        b.    <u>Defendants' Proposed Construction:</u> "structure of data in a file (*e.g.*, .htm, .css, .svf, .bmp, .jpg, .gif)."

        c.    <u>Court's Construction:</u> "a particular way that information is encoded."

The Court concludes that the claim language, specification, and extrinsic evidence support its construction. The claim language does not use the phrase "file format," but rather "original format." ('353 patent col. 22 ll. 29) This suggests that the patentees did not seek to limit the claims to a file format, but rather claimed a broader notion of format.

Defendants' reliance on the specification is unavailing. The cited portions of the specification using the terms file and format together specifically mention storage or particular types of files. For example, Defendants quote from the specification: "[t]hese files will typically comprise data stored in one of several . . . formats, including [specific file types]." (*Id.* at col. 8 ll. 14-18) Similarly, Defendants quote from other portions of the patent in which file and format are used together – but in separate sentences and in the context of storage. (*See, e.g.*, *id.* at col. 6 ll. 6-10 ("transfer[ring] the vector formatted results . . . . Alternatively, SVF files can be cached or stored."))

8

The specification mentions "file format" several times, rather than "original format" or "format" alone. The Court concludes that "file format" is used to describe specific ways information is encoded in a file. For example, file format is used to describe "graphic file format GIF," as well as other specific file formats, such as HTML, XML, and JPEG. (*See id.* at col. 1 ll. 61-66) The specification does not define format, nor does it suggest that the term format is equivalent to file format. Rather, the different use of file format and format suggests that file format is a subset of the more general concept of format.

The extrinsic evidence supports this distinction. The dictionary cited by Plaintiff distinguishes between "file," "format," and "file format." (D.I. 480 Ex. 6 at 211, 222 (defining "file" as a "basic unit of storage," "format" as "the structure or appearance of a unit of data," and "file format" as "[t]he structure of a file that defines the way it is stored and laid out on the screen or in print"))

6.    **"vector-based content / scalable vector-based content"**

a.    Plaintiff's Proposed Construction: "vector-based content": "content that includes one or more vectors."

"scalable vector-based content": "content that (1) is capable of being rendered at multiple zoom levels and (2) includes one or more vectors."

b.    Defendants' Proposed Construction: "scalable vector-based content": "scalable content that includes, for each object, a directional data structure storing X & Y values from a single point for the page or frame to the object."

c.    Court's Construction: "vector-based content": "content that includes one or more vectors."

"scalable vector-based content": "content that (1) is capable of being rendered at multiple zoom levels and (2) includes one or more vectors."

9

The parties dispute whether vector-based content and scalable vector-based content should be construed together or separately. The Court concludes that "vector-based content" and "scalable vector-based content" are different terms that require separate construction.

Claim 33 states that "a portion of the scalable content comprises vector-based content." ('353 patent col. 25 ll. 21-22) Claim 43 states that "a portion of the scalable content comprises scalable vector-based content." (*Id.* at col. 26 ll. 20-21) These claims suggest, then, that scalable content may be comprised of both vector-based content and scalable vector-based content. This supports a conclusion that the two terms should be separately construed.

The parties agree that vector-based content requires one or more vectors. (D.I. 499 at 11; D.I. 500 at 12) With respect to "scalable vector-based content," both sides' constructions essentially combine the terms "scalable" and "vector." The Court sees no material difference in the proposed constructions. The Court will construe "scalable vector-based content" consistent with "vector-based content" and adopt Plaintiff's construction.

7.  **"vector"**

    a.  Plaintiff's Proposed Construction: "a mathematical expression representing a length and a direction in a two-dimensional space. In an X, Y coordinate system, a vector is represented by a value of X2, Y2 relative to an origin point, represented by X1, Y1."

    b.  Defendants' Proposed Construction: "for each object, a directional data structure that stores X & Y values from a single point for the page or frame to the object."

    c.  Court's Construction: "for each object, a directional data structure that stores X & Y values from a point for the page or frame to the object."

The claim language, intrinsic evidence, and extrinsic evidence support the Court's construction. For example, claim 5 states that a vector is generated between a primary datum and

10

an object datum. ('353 patent col. 23 ll. 4-9)  The specification similarly defines a vector as a

data structure from a point to another, stating that "the vector for a given object may be stored as

the XY value of the datum point of that object relative to 0,0." (*Id*. at col. 18 ll. 3-8)  Likewise,

the prosecution history confirms that a vector is a directional data structure defined by "length

and direction." (D.I. 480 Ex. 4 at FH003593)

Plaintiff correctly points out that the specification uses the verb "may," rather than

"must," when describing storing the vector.  The Court, however, concludes that the word "may"

refers to how the vector is stored, rather than if the vector is stored at all.  (*See* '353 patent col. 18

ll. 3-5, 8-10 (stating that "vector may be stored as . . . the datum point of that object" or the

"vector may be stored as . . . a datum point corresponding to the upper left hand corner of the

[object]"))

The Court finds persuasive the Examiner's definition of vector provided in the inter

partes reexamination of the '353 patent.[3]  (D.I. 478 Ex. F at FH_DEF000018)  The Examiner

defines vector as "directional data structure stores X & Y values from known datum (primary

datum) to object bounding box (object datum)[.]  Vector between these points is generated for

each object[.]" (*Id*.)  Defendants' construction is consistent with the Examiner's definition,[4]

except that Defendants import an additional limitation that there is "a single point for the page or

frame to the object."  The Court is not persuaded that it should adopt this additional limitation.

---

[3]In support of its definition, the Examiner cites to the Microsoft Computer Dictionary, Fifth Edition (2002).  (D.I. 478 Ex. F at FH_DEF000018)

[4]Plaintiff is also of the view that "[t]he Examiner's construction is largely consistent" with its own.  (D.I. 479 at 10)

8.   **"object datum"**

    a.   <u>Plaintiff's Proposed Construction:</u> "reference point for an object."

    b.   <u>Defendants' Proposed Construction:</u> "X,Y coordinate for an object that is defined across objects at a consistent location on the objects."

    c.   <u>Court's Construction:</u> "reference point for an object used in a predictable manner."

The prosecution history and specification support the Court's construction. The prosecution history includes the statement that "a combination of upper and lower left-hand corners may be employed for object datums, as long as the use for particular object types is consistent." (D.I. 480 Ex. 4 at FH003587) The specification states that "[i]n general, the datum points for each object may also be located any place on the object, as long as the object datum points are used in a predictable manner." ('353 patent col. 17 ll. 57-59) To be used in a predictable manner, the reference point does not need to be the same on all objects. For example, the reference point could be located on the upper corner of some object types, while on the lower corner of other object types. Thus, the Court declines to adopt Defendants' overly narrow construction. However, Plaintiff's construction improperly broadens the scope of the claims, and thus the Court adds the limitation that the object datum be used in a predictable manner.[5]

9.   **"primary datum"**

    a.   <u>Plaintiff's Proposed Construction:</u> "an origin point defined at an X,Y coordinate."

    b.   <u>Defendants' Proposed Construction:</u> "single point defined at a fixed X,Y coordinate on the full-size web page."

---

[5]During the *Markman* hearing, Plaintiff's counsel stated that "the patent specification says that you can put the object point at any place on the object so long as the object points are used in a predictable manner." (Tr. at 103)

12

      c.    Court's Construction: "a fixed origin point defined at an X,Y coordinate."

The parties have three disputes: (1) whether the primary datum is a single point or an origin point, (2) whether the X,Y coordinate must be fixed, and (3) whether the X,Y coordinate must be on the full-size web page.

The claim language supports a construction using an origin point. For example, claim 5 states "generating a vector *from the primary datum to* the object datum for the object." ('353 patent col. 23 ll. 4-9) (emphasis added) The written description and figures of the patent further support a conclusion that the primary datum is the origin point for vectors. (*See, e.g., id.* fig. 5 box 158)

The intrinsic evidence supports the conclusion that the primary datum is fixed. Plaintiff's argument to the contrary instead seems to support this conclusion. In its opening brief, Plaintiff states that a person of ordinary skill in the art would understand that "page datum" is a type of "primary datum." (D.I. 479 at 11) The specification explicitly states that the page datum "remains fixed." ('353 patent col. 19 ll. 62-63) Additionally, the specification states that the primary datum is "used consistently throughout the process," suggesting it is a fixed point. (*Id.* at col. 17 ll. 51-53) Likewise, Figures 4F and 4G depict the primary datum point, 262', as fixed.

Finally, the Court finds a full-size web page limitation to be unsupported. The claim language refers to the primary datum "corresponding to the original page layout" but does not equate the original page layout with "full-size web page." As Plaintiff points out, full-size web page does not appear in the patent.

10. **"layout location datum"**

    a.    <u>Plaintiff's Proposed Construction</u>: "one or more points corresponding to the location of the object."

    b.    <u>Defendants' Proposed Construction</u>: "point defined at a fixed X,Y coordinate on the full-size web page that corresponds to an object."

    c.    <u>Court's Construction</u>: "point defined at an X,Y coordinate that corresponds to the location of the object."

The parties dispute: whether the layout location datum (1) has one or more points, (2) is a fixed X,Y coordinate, and (3) requires a full-size web page. The Court concludes that the layout location datum is a point defined by an X,Y coordinate.

While the Court adopts the language "point defined at an X,Y coordinate," the Court does not intend to limit the term to a single point. The Court finds such a limitation is unsupported.

As discussed above, primary datum is a reference point for an object defined at an X,Y coordinate; therefore, the layout location datum is also a point defined at an X,Y coordinate. Defendants fail to identify evidence to support a conclusion that the layout location datum remains fixed. Defendants merely state that because the layout location datum serves as the endpoint to an initial vector beginning at the primary datum, the layout location datum must remain fixed. The Court is not persuaded that the specification supports this conclusion.

The Court declines to construe the claims to include "a full-size web page," as the Court has already rejected the same arguments for this limitation in connection with the previous term.

11. **"enabling the user to zoom and pan a view of the Web page"**

    a.    <u>Plaintiff's Proposed Construction</u>: "enabling the user to zoom and move around the web page."

      b.     <u>Defendants' Proposed Construction:</u> "using the scalable content to allow the user to resize and move around the web page."

      c.     <u>Court's Construction:</u> "enabling the user to use scalable content to zoom and move around the web page."

The specification supports the Court's construction. Throughout the patent – in the Abstract, Background of the Invention, Brief and Detailed Summary of the Invention – the patentees state that scalable content enables zooming and moving around a web page. (*See* '353 Abstract; '353 patent col. 1 ll. 43-46; col. 2 ll. 29-31; col. 18 l. 67- col. 19 l. 3) For example, the Brief Summary of the Invention states that "[t]he scalable content and/or data derived therefrom are then employed to enable the Web content to be rapidly rendered, zoomed, and panned." ('353 patent col. 2 ll. 29-31) Furthermore, the specification states that it is the scalable content being zoomed and panned that distinguishes the present invention from the prior art. (*See id*. at col. 17 ll.42-45)

The patents do not depart from the plain and ordinary meaning of the word "zoom" and there is no need to construe it. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012). The specification and figures support the conclusion that zoom is used with its plain and ordinary meaning. (*See, e.g.*, '353 patent figs. 8A, 8B; col. 20 ll. 60-62)

**12. "fit across"**

      a.     <u>Plaintiff's Proposed Construction:</u> this term has a plain and ordinary meaning and does not need to be construed.

b.  Defendants' Proposed Construction: "fit across": "fully fill."

"fit across the display": "fully fill the display."

"rendered to fit across the display": "rendered to fully fill the display."

"displayed to fit across the touch-sensitive display": "displayed to fully fill the touch-sensitive display."

"displayed to fit across at least one of a width and height of a display area of the touch-sensitive display": "displayed to fully fill at least one of a width and height of a display area of the touch-sensitive display."

c.  Court's Construction: this term has a plain and ordinary meaning and does not need to be construed.

The patentees have not departed from the plain and ordinary meaning of this term. The specification describes an embodiment that uses only a portion of the screen to display the web content. (*See* '353 patent col. 19 ll. 63-65) This undermines Defendants' contention that "fit across" as used in the patent requires a fully-filled display. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (stating that proper construction rarely excludes preferred embodiments). Moreover, the patent drawings depict screens in which the display does not fully fill the screen, and the prosecution history states that the display may contain optional small borders. (*See* '353 patent fig. 7B; D.I. 480 Ex. 3 at FH001339-40)

Defendants point to an amendment made during prosecution, by which the patentees removed the word "substantially" from "fit substantially across." (D.I. 478 Ex. E at FH001338-39) This portion of the prosecution history does not change the resolution of the parties' dispute, particularly as the patentees stated at the time of the amendment that "the intended scope of the corresponding claims (*i.e.*, as originally intended by the Applicants) has not changed due to the removal of the word 'substantially.'" (*Id.*)

16

13. **"tapping"**

    a.    <u>Plaintiff's Proposed Construction:</u> this term has a plain and ordinary meaning and does not need to be construed.

    b.    <u>Defendants' Proposed Construction:</u> "making contact with the display using a stylus."

    c.    <u>Court's Construction:</u> this term has a plain and ordinary meaning and does not need to be construed.

The Court concludes that tapping has a plain and ordinary meaning. Defendants' proposed construction would improperly import a limitation from an embodiment of the invention. The specification makes clear that tapping is not limited to tapping with a stylus. While tapping with a stylus is an example of the invention's functionality, the Brief Summary of the Invention suggests that tapping may include other "tap-based inputs" such as with touch-sensitive displays. (*See* '353 patent col. 2 ll. 43-46; col. 20 ll. 58-62) Importing the requirement of using a stylus would be improper as the patentees have not departed from the plain and ordinary meaning of the term. *See Innova/Pure Water, Inc. v. Safar Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).

14. **"preserve(s) / preserved / preserving / preservation"**[6]

    a.    <u>Plaintiff's Proposed Construction:</u> this term has a plain and ordinary meaning and does not need to be construed.[7]

    b.    <u>Defendants' Proposed Construction:</u> those terms are indefinite and therefore cannot be construed.

---

[6]Pursuant to the Court's Order (D.I. 560), the parties submitted supplemental briefing with respect to their dispute on these terms. (*See* D.I. 612; D.I. 613; D.I. 623; D.I. 624)

[7]In a post-hearing letter to the Court (D.I. 612), Softview proposes an alternative construction: "keeps substantially the same or identical look and feel." Softview continues to prefer a construction of "plain and ordinary meaning." (*Id.*)

17

c. Court's Construction: this term has a plain and ordinary meaning and does not need to be construed.

"Only claims not amenable to construction or insolubly ambiguous are indefinite."

*Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250 (Fed. Cir. 2008) (internal

quotation marks omitted). To prove indefiniteness, "an accused infringer [must] show[] by clear

and convincing evidence that a skilled artisan could not discern the boundaries of the claim based

on the claim language, the specification, and the prosecution history, as well as her knowledge of

the relevant art area." *Id*. at 1249-50. Here, Defendants fall short of this "exacting standard." *Id.*

at 1249.

Defendants' expert, Dr. Grimes, states that the specification does not inform one of

ordinary skill in the art the extent to which a layout may change and still remain "preserved."

(*See* D.I. 478 Ex. J at ¶ 10) However, Dr. Grimes recognizes that the intrinsic evidence describes

three instances in which layout remains preserved: changes made to font and font sizes due to

rendering limitations (*see id*. at ¶ 14); exact preservation (*see id*. at ¶ 11); and at least one

example of a preserved display (*see id*. at ¶ 13). Moreover, Plaintiff provides an expert opinion,

contrary to that of Dr. Grimes, that one of ordinary skill in the art would be able to discern the

boundaries of preservation (*see* D.I. 481 at ¶ 13), and cites to several examples of preserved

layouts (*see* D.I. 500 at 24-26).

The specification and prosecution history support the conclusion that the term is not

insolubly ambiguous. The specification describes the invention as preserving displays to

"provide substantially the same or identical layout as the original Web page" and "maintain[] the

look and feel of browsing such pages with a conventional desktop browser." ('353 patent col. 2

18

ll. 32-33, 54-56; *see also generally* Tr. at 166 (defense counsel stating it "is easy" to agree that a

web page is "preserved" when the look and feel remain "exact")) The prosecution history

similarly describes the invention as displaying rendered content with "the original layout and

attributes of the Web page (as rendered at the original resolution)" and provides an example

using font size. (D.I. 480 Ex. 3 at FH001211; *id.* at Ex. 4 at FH00357, 87)

Defendants have not presented clear and convincing evidence that the term is insolubly

ambiguous.

### 15.   "machine-readable medium"

   a.   Plaintiff's Proposed Construction: "the machine-readable medium may
include, but is not limited to, floppy diskettes, optical disks, ROMs,
RAMs, EPROMs, EEPROMs, magnetic or optical cards, flash memory, or
other type of media/machine-readable medium suitable for storing
electronic instructions."

   b.   Defendants' Proposed Construction: "a medium for electronic instructions,
such as a floppy disk, optical disk, CD-ROM, magneto-optical disk, ROM,
RAM, EPROM, EEPROM, magnetic or optical card, flash memory, or
carrier wave."

   c.   Court's Construction: "a medium for storing electronic instructions, such
as a floppy disk, optical disk, CD-ROM, magneto-optical disk, ROM,
RAM, EPROM, EEPROM, magnetic or optical card, flash memory, or
carrier wave."

The parties dispute: (1) whether the medium requires storing of electronic instructions,

and (2) whether a carrier wave may be included.

The claim language supports the Court's construction. Claim 252 states that instructions

are "tangibly stored thereon," referring to a machine-readable medium. ('353 patent col. 43 ll.

17-19)

The specification supports the inclusion of a carrier wave, as it explicitly states that

19

"herein, a carrier wave shall be regarded as comprising a machine-readable medium." (*Id.* at col.

4 ll. 40-41)  Given this statement, the fact that a carrier wave was defined in another case as

"devoid of any semblance of permanence," *In re Nuijten*, 500 F.3d 1346, 1356-57 (Fed. Cir.

2007), is not especially relevant.  A patentee's definition controls the interpretation of a term as it

is used in a particular patent.  *See Toro Co. v. White Consolidated Indus. Inc.*, 199 F.3d 1295,

1301 (Fed. Cir. 1999) (stating that terms are not construed in "lexicographic vacuum, but in the

context of the specification and drawings"); MPEP §§ 2111.01, 2173.05(a) (8th ed. Rev. 9, Aug.

2012).

**16.** **"storage means"**

    a. <u>Plaintiff's Proposed Construction:</u> <u>Function:</u> "storing a plurality of instructions."

        <u>Corresponding structure:</u> "memory."

    b. <u>Defendants' Proposed Construction:</u> <u>Function:</u> "storing a plurality of instructions."

        <u>Corresponding structure:</u> "a floppy disk, optical disk, CD-ROM, magneto-optical disk, ROM, RAM, EPROM, EEPROM, magnetic or optical card, flash memory or carrier wave."

    c. <u>Court's Construction:</u> <u>Function:</u> "storing a plurality of instructions."

        <u>Corresponding structure:</u> "a floppy disk, optical disk, CD-ROM, magneto-optical disk, ROM, RAM, EPROM, EEPROM, magnetic or optical card, flash memory, or carrier wave."

The parties agree that this is a means-plus-function term, *see* 35 U.S.C. § 112 ¶ 6, and

that the function is storing a plurality of instructions.  Their main dispute is whether the

corresponding structure should include a carrier wave.  Again, the Court sides with Defendants

on this point.

As discussed above, the patentees stated that a carrier wave shall be regarded "as comprising a machine-readable medium." ('353 patent col. 4 ll. 40-41) The claims state that "a plurality of instructions" are "tangibly stored" on "a machine-readable medium." (*Id.* at col. 43 ll. 17-19) Plaintiff's citation to other cases and extrinsic evidence defining a carrier wave differently is not especially relevant, given the statements of the patentees.

17.   **"processing means"**

a.   Plaintiff's Proposed Construction: Function: "processing."

Corresponding structure: "a processor, microcontroller, or logic circuitry."

b.   Defendants' Proposed Construction: Function #1: "rendering a browser interface via which a user is enabled to request access to an original Web page, the Web page comprising HTML-based Web content having an original format defining an original width and height of the Web page and an original page layout, functionality, and design of content on the Web page."

Structure corresponding to Function #1: indefinite, as the specification does not disclose any algorithm for rendering a browser interface.

Function #2: "retrieving the Web page via the wireless communication means."

Structure corresponding to Function #2: indefinite, as the specification does not disclose any structure corresponding to "wireless communication means."

Function #3: "translating at least a portion of the HTML-based Web content from its original format into scalable content that supports a scalable resolution independent representation of the Web page that preserves the original page layout, functionality and design of the content defined by its original format when scaled and rendered."

Structure corresponding to Function #3: "the algorithm depicted at boxes 150-160 of Fig. 5 (also depicted at box 114 of Fig. 2C), and '353 patent at 3:50-52, 10:31-55, 15:43-18:39."

21

Function #4: "scaling the scalable content to render the Web page on the display such that a width of the Web page is rendered to fit across the display."

Structure corresponding to Function #4: "the algorithm depicted at boxes 160-172 of Fig. 6, and the corresponding text at '353 patent at 3:53-55, 19:14-20:47, wherein the scale factor is chosen such that the width of the Web page fits across the display."

c.   Court's Construction: Function: "processing."

Corresponding structure: "a processor, microcontroller, or logic circuitry."

The Court's construction is supported by the claim language and specification. The four functions called out by Defendants – rendering, retrieving, translating, and scaling – are not part of the "processing means" claim element. Processing means is the first element of the claim and does not contain further limitations or elaboration. (*See* '353 patent col. 22 l. 16) In the claim, the recited functions are located ten lines below processing means, separated by "wireless communications means," "a display," "memory," and "storage means." (*Id.* at col. 22 ll. 17-22)

Moreover, the claim language supports the conclusion that the processing means merely execute instructions. The claim states "a plurality of ***instructions are stored that when executed by the processing means*** enable the wireless device to perform the [four functions]." (*Id.* at col. 22 ll. 22-24) (emphasis added) The structure of the claim indicates that the processing means executes instructions, and then the device renders, retrieves, translates, and scales. It is further instructive that claim 36 of the patent recites Defendants' four functions but fails to claim any processing means. (*See id.* at col. 25 ll. 31-57; Tr. at 188-89)

Defendants argue that Plaintiff's construction is improper because the corresponding structure must be an algorithm. (D.I. 478 at 27) The parties agree that an algorithm is not

22

required when a general purpose computer, without any special programming, can perform the function. (*See id.* at 27 n.14; D.I. 500 at 27)  Here, the specification notes that a "general-purpose" processor programmed with instructions can perform the claimed functions. ('353 patent col. 4 ll. 20-22)  Neither the claim language nor specification indicate that any special programming is required.  It follows that an algorithm is not required. *See, e.g.*, *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (stating that patentee did not claim functions performed by special purpose computer and "processing" could be "achieved by any general purpose computer without special programming").

The Court's construction of the corresponding structure is supported by the specification. The specification states that a general or special purpose processor, logic circuits, or microcontroller may be sufficient. (*See* '353 patent col. 4 ll. 20-21; col. 22 ll. 1-6)

18. **"wireless communication[s] means"**

    a.    Plaintiff's Proposed Construction: Functions: "facilitate wireless communication with a network that supports access to the Internet."

           "facilitate communication with a mobile service provider network via which Web content may be accessed."

           "facilitate wireless communication with a network via which Web content may be accessed."

           Corresponding structure: "an antenna."

    b.    Defendants' Proposed Construction: Functions (the appropriate function depends upon the specific claim):

           "facilitating wireless communication with a network that supports access to the internet ('353 patent claim 33 by reference to claim 1)."

23

"facilitating communication with a mobile service provider network via which Web content may be accessed ('926 patent claim 30 and claims 31, 40, 41, and 43 by reference to claim 30)."

"facilitating wireless communication with a network via which Web content may be accessed ('926 patent claims 55, 59, 72, and 75 by reference to claim 52)."

Corresponding structure: indefinite, as the specification does not disclose any structures corresponding to this limitation.

c.    Court's Construction: Functions: "facilitate wireless communication with a network that supports access to the Internet."

"facilitate communication with a mobile service provider network via which Web content may be accessed."

"facilitate wireless communication with a network via which Web content may be accessed."

Corresponding structure: "an antenna."

The parties only disagree over the corresponding structure for the term. The Court's construction is supported by the specification and Plaintiff's expert's opinion.

"[A] challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." *Buddle v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77 (Fed. Cir. 2001). Defendants fail to meet this heavy burden.

Defendants initially attempted to argue that because the specification does not contain the word "antenna," it fails to disclose it. (D.I. 478 at 29) In their reply brief, Defendants amend their argument and state that the specification does disclose an antenna. (D.I. 499 at 29) Defendants use conclusory statements to argue, without evidentiary support, that an antenna

alone is not capable of performing the functions. (D.I. 478 at 29)

Plaintiff, on the other hand, supports its corresponding structure with the drawings in the specification, as well as expert opinion. Dr. Reinman opines that Figures 1A and 1B depict an antenna receiving wireless communications from a wireless communications tower connected to the internet. (D.I. 481 at ¶ 18) Dr. Reinman further opines that one of ordinary skill in the art would interpret the figures in the same manner, additionally noting that "wireless communications are accomplished using antennas, and it seems unlikely that the external antenna would serve any other purpose." (*Id.* at ¶ 19) Finally, Dr. Reinman states that without the antenna, wireless communication would not be possible. (*Id.* at ¶ 20)

## IV.  CONCLUSION

For the foregoing reasons, the Court will construe the disputed claim terms in the '353 and '926 patents consistent with this Memorandum Opinion. An appropriate Order follows.